**Rita FLYNN, Plaintiff,**

v.

**NEW YORK STATE DIVISION OF PAROLE and Michael Burdi, Regional Director, New York State Division of Parole, Defendants.**

No. 07 Civ. 5821(WCC).

United States District Court, S.D. New York.

March 6, 2009.

("DOP") and Michael Burdi, Regional Director of DOP ("Burdi," and together with DOP, "defendants"), asserting violations of Title VII of the Civil Rights Act of 1964 against DOP and violations of her "right to equal employment opportunity" under the Fourteenth Amendment against Burdi pursuant to 42 U.S.C. § 1983.[1] Plaintiff alleges that she suffered disparate treatment due to unlawful discrimination based on her gender as well as retaliation for making complaints of such treatment. Defendants now move for summary judgment. Defendants also move to strike certain evidence submitted by plaintiff in her response papers. For the reasons set forth below, defendants' motion for summary judgment is granted in part and denied in part. We do not consider defendants' motion to strike because we did not rely on the evidence at issue in our decision.

Bergstein & Ullrich, LLP, Helen G. Ullrich Esq., Stephen Bergstein, Esq., of counsel, Chester, NY, for Plaintiff.

Andrew M. Cuomo, Attorney General of the State of New York, Julia H. Lee, Esq., Ass't Attorney General, of counsel, New York, NY, for Defendants.

### OPINION AND ORDER

CONNER, Senior District Judge.

Plaintiff, Rita Flynn, brings this action against New York State Division of Parole

## BACKGROUND

Unless otherwise indicated, the following facts are undisputed.

### I. The Parties

Plaintiff, who is female, has been employed as a parole officer for DOP since 1979. (Defs. R. 56.1 Stmt. ¶ 1.) DOP is a state agency "whose mission is to promote public safety by preparing inmates for release and supervising parolees to the successful completion of their sentence[s]." (Id. ¶ 2.) Burdi has been employed by DOP as a Regional Director for Region III since 2000.[2] (Id. ¶ 3.) As the Regional Director,

1. Plaintiff alleges that she was subjected to a "hostile work environment" in retaliation for complaining of gender discrimination. (Complt.¶ 33.) Thus, she appears to plead hostile work environment as an element of her retaliation claim and not as a separate cause of action. Further, she has neither pled a hostile work environment claim in her Complaint nor has either party briefed it as if it were a separate cause of action. We, therefore, do not treat the claim as a separate cause of action. See, e.g., Kear v. Katonah Lewisboro Cent. Sch. Dist., 2007 WL 431883, at *3 (S.D.N.Y. Feb.7, 2007); Raia v. Ill. Tool Works Inc., 2007 WL 608129, at *6 n. 4 (E.D.N.Y. Feb.23, 2007).

2. Region III covers Nassau, Suffolk, Orange, Putnam and Westchester Counties. (Defs. R. 56.1 Stmt. ¶ 3.)

Burdi oversees the daily supervision of parolees and the approximately 170 members of the parole staff in Region III. (*Id.*)

DOP employs approximately 1,500 peace officers[3] throughout New York State. (*Id.* ¶ 4.) The powers and duties of DOP are prescribed by statute. (*Id.*) Parole officers have "substantial investigative and arrest powers, playing an important role within the criminal justice system for the maintenance of public safety." (*Id.*) The work of parole officers involves "considerable activity" on the streets, as they monitor parolees who have been released into society. (*Id.*) Because parole officers must spend significant amounts of time out of the office, "it is critical that parole officers report to their supervisors about their whereabouts while on duty out of the office." (*Id.*) DOP operates by a chain of command, pursuant to which each employee reports to a supervisor. (*Id.* ¶ 5.) In the "area offices," each parole officer is assigned to a unit run by a SPO. (*Id.*) The SPOs report to an Area Supervisor, who in turn reports to a Regional Director. (*Id.*) Parole officers are required to submit "flight plans (projected work schedules), times [sic] sheets, CMS[4] entries, community preps, stability scale, pre-approval for overtimes and call ins to [their] [S]enior [P]arole [O]fficer." (*Id.* ¶ 37.)

Jose Burgos ("Burgos") has been the Director of Human Resource Management ("HR") since January 2003. (*Id.* ¶ 6.) In this position, he is responsible for oversight of the Labor Relations Unit, the Staff Development and Training Unit, as well as the Personnel Office. (*Id.*) His office also handles complaints lodged against parole officers. (*Id.*) Prior to 2007, complaints made against parole officers were handled by the Office of Professional Responsibility ("OPR"). (*Id.* ¶ 7.) Since 2007, HR has handled all such complaints. (*Id.*)

According to defendants, "DOP has a progressive disciplinary system." (*Id.* ¶ 8.) Defendants outline the steps in the disciplinary process as follows:

> Generally, the first step is to counsel the employee. If there is no change in behavior, then the next step is guidance and instruction to the supervisor to counsel the employee again using verbal or written counseling methods. Counseling does not constitute a disciplinary action. Only [HR] can discipline a parole officer, after issuing a Notice of Discipline.

(*Id.*)[5]

Since 2003, a number of new policies have been implemented at DOP "which [make] parole officers more accountable for their work both out in the field and in the office." (*Id.* ¶ 9.) In 2003, DOP began to require parole officers to "put into their projected work hours the actual hours to be spent in the office and the field." (*Id.*) In 2005, DOP started requiring parole officers to report back to the office at the end of each work day. (*Id.*) Prior to these changes, "parole officers had more control

---

**3.** Peace officers include parole officers, senior parole officers ("SPOs") and warrant officers. (Defs. R. 56.1 Stmt. ¶ 4.)

**4.** "CMS is the DOP computer program instituted in approximately late 2005 requiring all parole officers to update and input information concerning their cases." (Graham Decl. ¶ 10.)

**5.** Plaintiff denies this general description of DOP's disciplinary system and directs the

Court to a statement by one of plaintiff's co-workers, James Jones ("Jones"). (Pl. Resp. R. 56.1 Stmt. ¶ 8.) However, nothing in Jones's statement contradicts the description set forth by defendants, although it adds that "[c]ounseling memos are the third step" in the disciplinary process and that the procedure is part of a Collective Bargaining Agreement between DOP and the Public Employees Federation ("PEF"). (Jones Aff. ¶ 48.)

and autonomy over how they spent their hours." (*Id.*)

## II. *The Peekskill Area Office*

The Peekskill Area Office is located in Region III. (*Id.* ¶ 10.) David Bush ("Bush") has been the Area Supervisor of this office since November 2004. (*Id.*; Bush Decl. ¶ 2.) As Area Supervisor, Bush reports directly to either the Deputy Regional Director or the Regional Director for Region III. (Defs. R. 56.1 Stmt. ¶ 10.) There are approximately 28–30 parole officers assigned to the Peekskill Area Office, including four SPOs. (*Id.* ¶ 11.) To become an SPO, "one must take an [sic] civil service examination, achieve a satisfactory grade on the examination, and then be interviewed and selected for [an] open SPO position." (*Id.* ¶ 12.) All parole officers have a mixed caseload, supervising parolees with various criminal backgrounds, unless an officer has been designated to a "special assignment." (*Id.* ¶ 14.)

In the Peekskill Area Office, there are two special assignments to which a parole officer may be designated: the Absconder Search Unit and the Special Offender Unit ("SOU"). (*Id.* ¶ 15.) Parole officer positions in these two units "hold the same rank, title, compensation and benefits as any regular parole officer position. The difference is the type of parolees the parole officer supervises." (*Id.*)

### A. *SOU Parole Officers*

SOU parole officers are responsible for the supervision of "special offender parol-ees," "which can include high profile cases." (*Id.* ¶ 16.) [6] They have a reduced caseload of 25 parolees per officer [7] so that they "can devote more time to these special cases that are of high interest to the community and are of a sensitive nature." (*Id.*) An SOU parole officer serves "at the pleasure of the appointing authority" and has no inherent right to remain in such position, and SOU parole officers are so informed. (*Id.* ¶ 17.) According to defendants, "[t]here is no difference in [the] pay, rank or status" of an SOU parole officer and that of a non-special assignment parole officer. (*Id.* ¶ 18.) However, plaintiff disputes this and contends that while a transfer to the SOU is not a promotion, "[SOU] assignments are often a road to promotion, as the parole officer develops special skills, including leadership skills." (Pl. Resp. R. 56.1 Stmt. ¶ 18; Flynn Aff. ¶ 12.)

There are SOU parole officer positions in other area offices within Region III and these positions are filled by both male and female parole officers. (Defs. R. 56.1 Stmt, ¶ 19.) Constance Augustin, a female, was the SOU parole officer for Suffolk County from 2003 to 2007, and Sulay O. Gomez–Cox, also a female, is currently the SOU parole officer for Westchester County. [8] (*Id.*)

### B. *The Orange County Sex Offender Task Force*

The Orange County Sex Offender Task Force (the "Task Force") was formed in approximately 2003 by various state and county entities to encourage collaboration

---

6. Because the majority of an SOU parole officer's caseload may consist of sex offender parolees, an SOU parole officer is sometimes referred to as a "Sex Offender" parole officer. (Defs. R. 56.1 Stmt. ¶ 16.)

7. Parole officers not assigned to the SOU have a caseload of 40 parolees per officer. (Burdi Decl. ¶ 7.)

8. Plaintiff neither admits nor denies this information about the sex of other SOU officers in Region III, stating that she has no knowledge of it. (Pl. Resp. R. 56.1 Stmt. ¶ 19.)

for the successful management of sex offender parolees in Orange County. (*Id.* ¶ 23.) The Task Force is comprised of representatives from several organizations, including the Orange County Department of Mental Health, DOP, the Orange County Division of Probation, the Orange County District Attorney's Office, the State Police, the Orange County Department of Social Services and the New York State Office of Mental Health. (*Id.*) The Task Force holds monthly meetings. (*Id.*) Cira DePietro ("DePietro"), Parole Services Program Specialist, was "instrumental in [the Task Force]'s creation" and attended the meetings as a representative for DOP.[9] (*Id.*)

### C. Treatment of Female Parole Officers [10]

According to plaintiff, female parole officers are treated differently from their male counterparts "and this culture permeates the workplace." (Pl. R. 56.1 Stmt. ¶ 9, citing Walsh Aff. ¶¶ 4–5.) Plaintiff asserts that "female [p]arole [o]fficers who exhibit the same assertive conduct and manners as their male counterparts are targeted by Region [III] management for criticism and reassignment." (Pl. R. 56.1 Stmt. ¶ 10, citing Walsh Aff. ¶ 6.) Plaintiff also asserts that "[f]emale [p]arole [o]fficers who complain about their working conditions are labeled as 'hysterical' and 'out of control' by Region [III] management," and that "Region [III] management refuses to acknowledge or investigate complaints of gender discrimination made by female [p]arole [o]fficers" and "tolerates lewd and sexist comments in the workplace." (Pl. R. 56.1 Stmt, ¶¶ 11–13, citing Walsh Aff. ¶¶ 7–9.) According to plaintiff, who cites her own sworn statement, in June 2003, a male parole officer in Region III was charged with referring to his female co-workers with lewd and pejorative terms in the workplace, but, at Burdi's direction, he was not disciplined. (Pl. R. 56.1 Stmt. ¶ 14, citing Flynn Aff. ¶ 18.)

Plaintiff also offers Walsh's statement that "[m]anagement ... subjects female [p]arole [o]fficers to unwarranted criticism for minor rule infractions but overlooks the same infractions by male [p]arole [o]fficers." (Pl. R. 56.1 Stmt. ¶ 16, citing Walsh Aff. ¶ 10.) For example, according to plaintiff, who cites her own affidavit, a female parole officer was disciplined for having an accident while driving a state-owned vehicle, while "similarly-situated male [p]arole [o]fficers are not disciplined." (Pl. R. 56.1 Stmt. ¶ 17, citing Flynn Aff. ¶ 21.)

Plaintiff also cites a statement made by Walsh for the proposition that, under Burdi's direction, Region III management will discuss complaints made by parolees and their families against male parole officers with those officers "to obtain their side of the story," but that "management credits the parolees' complaints about female officers without any discussion." (Pl. R. 56.1 Stmt. ¶ 19, citing Walsh Aff. ¶ 11.)

### III. Plaintiff's Experiences Working at POP

Plaintiff was, at all times relevant to this action, a parole officer in the Peekskill

---

**9.** There are similar task forces in Nassau, Suffolk and Westchester Counties. (Defs. R. 56.1 Stmt. ¶ 23.)

**10.** Unless otherwise indicated, the information in this section, which is offered by plaintiff, is based entirely on the affidavit of Patricia Walsh ("Walsh"), a parole officer in the Peekskill Area Office (the "Walsh Affidavit").

(*See* Pl. Resp. R. 56.1 Stmt, ¶¶ 9, 10, 11, 12, 16, 17, 19.) Defendants move to strike the Walsh Affidavit from the record pursuant to FED.R.CIV.P. 56(e), on the ground that plaintiff failed to disclose Walsh as a witness as required by FED R.CIV.P. 26(a)(1). (Defs. Not. Mot. Strike Evid.) However, since we do not rely on the Walsh Affidavit in our inquiry here, it is not necessary to decide this motion.

Area Office. (Defs. R. 56.1 Stmt. ¶ 28.) She was supervised by SPO John McKeon ("McKeon") until approximately January 2006, by SPO Lois Fairchild ("Fairchild") from January 2006 to September 20, 2006 and by SPO Kathleen Graham ("Graham") from September 21, 2006 to May 3, 2008. (*Id.* ¶ 29.) Plaintiff has never taken an examination to be promoted to the position of SPO. (*Id.* ¶ 13.)

### A. Plaintiff's Position as the SOU Parole Officer

In 2003, plaintiff became the SOU parole officer. (*Id.* ¶ 30.) Her application for the position was approved by a committee of three individuals, including Burdi. (*Id.*) She held this position until October 1, 2006. (*Id.* ¶ 31.) Plaintiff contends that she worked "extremely hard in handling her sex offender parolee cases," that she "made strong efforts to place parolees in treatment programs or school" and "assist[ed] them in finding housing and jobs." (Pl. R. 56.1 Stmt. ¶ 30.)

Defendants state that "[i]n September 2006, . . . Bush recommended to . . . Burdi that [plaintiff] be removed as the SOU parole officer because [Bush] found her performance as the SOU parole officer unsatisfactory and determined that it was not in the best interest of DOP or [plaintiff] for her to stay in that position." (Defs. R. 56.1 Stmt. ¶ 21.) Plaintiff denies this and contends that "Burdi and Bush re-

moved [her] from her position in retaliation for her complaints of gender discrimination." (Pl. Resp. R. 56.1 Stmt. ¶ 21.) [11] Burdi and Burgos concurred with Bush's recommendation that plaintiff be removed from the SOU and, effective October 1, 2006, plaintiff was relieved of her SOU caseload and reassigned a mixed caseload of parolees. (Defs. R. 56.1 Stmt. ¶ 22.) Plaintiff was notified of the transfer on September 21, 2006. (Jones Aff. ¶¶ 20–21.) Plaintiff avers that, in response to her inquiry into the reason for her transfer, Bush stated, "because we can." (Pl. R. 56.1 Stmt. ¶ 97.) According to plaintiff, her transfer "was viewed as a demotion by [her] colleagues and representatives of community agencies with [which] she worked." (Pl. R. 56.1 Stmt. ¶ 98.)

### B. Plaintiff's Attendance at Task Force Meetings

While she was the SOU parole officer, plaintiff attended the Task Force meetings as a representative of DOP. (Defs. R. 56.1 Stmt, ¶ 24; DePietro Decl. ¶ 3.) According to defendants, in the fall of 2004, DePietro recommended to Burdi that plaintiff stop attending these meetings.[12] (Defs. R. 56.1 Stmt. ¶ 25.) Defendants contend that, as a result of DePietro's recommendation, Burdi prohibited plaintiff from attending any future meetings of the Task Force, however, plaintiff still remained in her position as the SOU parole officer and was instructed to attend any future case management meetings [13] with members of the

---

11. To support this contention, plaintiff directs the Court to her Memorandum of Law, Statement of Facts, but provides neither a page number for that document nor a reference to the record. It is unclear to the Court what evidence plaintiff relies on for her contention.

12. Plaintiff disputes this, contending that "Burdi made the decision to remove plaintiff from the [Task Force] before receiving any memorandum or e-mail from DePietro." (Pl. Resp. R. 56.1 Stmt. ¶ 25.) We note that plaintiff's contention does not actually conflict with defendants' proposition regarding DePie-

tro's recommendation to Burdi. Even if Burdi made the decision to remove plaintiff before receiving any memorandum or email from DePietro, this alone would not contradict defendants' contention that DePietro recommended plaintiff's removal to Burdi in the fall of 2004, as the recommendation could have been verbal.

13. Case management meetings, which are held to discuss the special needs of individual sex offender parolees with imminent release dates, are conducted on an as-needed basis. (Defs. R. 56.1 Stmt. ¶ 27.)

Task Force.[14] (*Id.* ¶ 26.) According to plaintiff, DePietro had reported to Burdi that plaintiff had insulted Assistant District Attorney Michael Milza ("Milza"), however, Burdi did not speak with plaintiff, her SPO, or Milza before removing plaintiff from the Task Force. (Pl. R. 56.1 Stmt. ¶¶ 36–37.) Burdi did not advise plaintiff of his reasons for removing her from the Task Force and, according to plaintiff, he refused to meet with her to discuss the matter.[15] (*Id.* ¶ 38.)

Plaintiff notes that both Bush and McKeon, her supervisor at the time, thought that she should have been restored to the Task Force. (*Id.* ¶¶ 67, 69.) McKeon "though[t] that [plaintiff] felt 'slighted' and that her credibility was tainted and the removal would effect [sic] her career path when she leaves the agency." (Flynn Aff., Ex. 3 at 1773.)

### C. Complaints Made About Plaintiff

During the relevant time period, OPR and HR received a number of complaints about plaintiff's demeanor and behavior from parolees, parolees' families and members of the community. (Defs. R. 56.1 Stmt, ¶ 32; Burdi Decl. ¶ 14.) Defendants contend that although another parole officer, John White, was formally disciplined and suspended for three days after making "misleading and offensive" comments to a parolee's wife in April 2005, plaintiff has never been disciplined by DOP "[in] any fashion." (Defs. R. 56.1 Stmt. ¶¶ 33–34.) Plaintiff contests defendants' assertion and states that she received "counseling memos" from her supervisors, which are the "third step in the DOP progressive disci-

plinary process." (Pl. Resp. R. 56.1 Stmt. ¶ 34; Jones Aff. ¶ 48.)

Plaintiff states, citing a statement by Patrick Lyons ("Lyons"), a parole officer at DOP, that she was "at all times a conscientious [p]arole [o]fficer who treated assigned parolees fairly and in accordance with DOP policy." (Pl. R. 56.1 Stmt. ¶ 20.) According to Lyons, "most of the parolees assigned to plaintiff's unit ... were either African–American or Hispanic, and many came from a culture that discouraged female authority," and, as a result, "many parolees had difficulty taking orders from a female [p]arole officer, and ... often questioned [her] authority." (*Id.* ¶¶ 21–22.)

Plaintiff asserts that, from 2000 to 2003, parolees learned that, if they complained about plaintiff, Burdi would transfer their cases to another parole officer. (*Id.* ¶ 23, citing Lyons Aff. ¶ 8.) According to plaintiff, Burdi transferred these cases without any investigation into the merits of the complaints. (Pl. R. 56.1 Stmt. ¶ 24, citing Lyons Aff. ¶ 9; Ullrich Aff'm, Ex. 3 (Flynn Dep. 89:23–90:2).) However, when parolees complained about male parole officers, Burdi did not transfer their cases from the male parole officer. (Pl. R. 56.1 Stmt. ¶ 25.) Plaintiff states further that "word quickly got around that if a parolee complained that plaintiff was a racist, he would be reassigned to another [p]arole [o]fficer." (*Id.* ¶ 26.) Plaintiff testified that the removal of cases from her undermined her credibility "with an appearance [that] something [she] was doing was unethical or wrong." (Ullrich Aff'm, Ex. 3 (Flynn Dep. 98:7–16).)

14. Plaintiff admits this, but "only to the extent Burdi removed plaintiff from the Task Force." (Pl. Resp. R. 56.1 Stmt. ¶ 26.) She provides no explanation or supporting citation for the portion of defendants' statement that she does not admit.

15. It seems that plaintiff later contradicts this by referring to a meeting she had with Burdi after she complained about her removal from the Task Force in a series of memos she sent him starting in April 2005. (*See* Background, Section III.E.)

#### D. *The Briggs Incident*

Around 2003, Reverend Coleman Briggs ("Briggs"), a minister in Newburgh, accused plaintiff of racism in dealing with parolees (the "Briggs Incident"). (Pl. R. 56.1 Stmt, ¶ 32.) According to plaintiff, as a result of this accusation, Burdi removed cases from her, without first investigating the charge against her and despite protests from her supervisor, co-workers and community agencies with which she worked. (*Id.* ¶ 33.) Burdi also refused to meet with her to resolve Briggs' complaints and refused "to permit plaintiff to meet with . . . Briggs." (*Id.*)

According to plaintiff, in April 2006, she received a telephone call from Briggs and, during their conversation, Briggs told her that he had been told that she refused to meet with him concerning his belief that she was racist. (*Id.* ¶ 34.) Plaintiff again asked Burdi to allow her to meet with Briggs, but received no response to this request. (*Id.*)

#### E. *Plaintiff's Initial Complaints of Disparate Treatment*

Beginning in April 2005, following plaintiff's removal from the Task Force, she sent a series of memos to Burdi, complaining that DOP and Burdi treated her differently than they treated her male colleagues. (*Id.* ¶ 39.) Burdi forwarded these memos to his supervisor and to DOP's EEO office, but no one from either EEO or HR contacted plaintiff to discuss her disparate treatment complaints. (*Id.*) However, Burdi did meet with plaintiff in the presence of Bush and McKeon, after receiving one of these memos from plaintiff. (*Id.* ¶ 40.) On July 13, 2005 plaintiff faxed to OPR a copy of a memo that she had previously sent to Burdi, in which she alleged discriminatory treatment on account of her gender, and included a reference to Burdi's decision to remove her from the Task Force. (*Id.* ¶¶ 41–42.) On

August 31, 2005, plaintiff also filed a complaint with the New York State Division of Human Rights ("SDHR") and the United States Equal Opportunities Commission ("EEOC") against DOP, alleging that DOP, through Burdi, discriminated against her because of her sex. (Defs. R. 56.1 Stmt. ¶ 45; Lee Decl., Ex. B; Complt. ¶ 7.)

HR and OPR conducted parallel internal investigations into plaintiff's allegations. (Flynn Aff., Ex. 3.) OPR's investigation was conducted by Fairchild, who was an OPR investigator at that time. (Defs. R. 56.1 Stmt. ¶ 46.) Plaintiff avers that "OPR failed to investigate [her] gender discrimination complaint." (Flynn Aff. ¶ 24.) According to Fairchild, she did investigate the gender-based disparate treatment claims, but only with the information that plaintiff gave her; she did not conduct an "extensive inquiry into the overall operation of the office," because such an inquiry requires a separate mandate. (Ullrich Aff'm, Ex. 4 (Fairchild Dep. 56:4–21).)

On November 29, 2005, OPR issued a report stating that plaintiff's complaint of disparate treatment could not be substantiated "without a more complete and extensive inquiry into the overall treatment of other parole officers," but that her complaint regarding her transfer from the Task Force was valid, as the decision was made "based on unsubstantiated allegations of poor behavior and misconduct." (Flynn Aff., Ex. 3 at 1768.) The report also confirmed plaintiff's allegations that Burdi had disclosed personal information about plaintiff and her family to the public, "in violation of Employee Manual Article 15." (*Id.*) Plaintiff contends that "despite [her] repeated requests, both individually and through her union, DOP refused to provide a copy of the report of its investigation and ultimately only did so upon Court order." (Pl. R. 56.1 Stmt. ¶ 73.)

### F. September 2005 Counseling Memo

According to plaintiff, on September 7, 2005, "Burdi directed Bush to reprimand plaintiff and issue a counseling memo to her when she appeared at the Area Office to pick up her paycheck. At the time, plaintiff was off-duty and not carrying her weapon." (*Id.* ¶ 63; see also Flynn Aff., Ex. 3 at 1774.) The memo indicates that plaintiff was observed in the office without her firearm, in violation of certain DOP rules. (Flynn Aff., Ex. 5.) Plaintiff contends that Burdi, when ordering Bush to issue this memo, did not first investigate her work status at the time of the incident and that "Bush knew that [she] was off-duty as he had her flight plan." (Pl. R.56.1 Stmt, ¶ 64; see also Flynn Aff., Ex. 3 at 1774.) According to an OPR report, Burdi explained that "he had a particular concern about [parole officers] working without their equipment and had counseled other officers (male) in the past," but he "acknowledged that these officers only received verbal counseling." (Flynn Aff., Ex. 3 at 1774.)

### G. The John Duck Incident

In early 2004, plaintiff issued a violation against a repeated sex offender, John Duck ("Duck"). (Pl. R. 56.1 Stmt. ¶ 51.) Plaintiff disagreed with the pre-release recommendation regarding the community in which he should live upon his release from prison due to the number of children who reside there. (*Id.*) She reported her disagreement to DePietro, but DePietro did not change the recommendation and, in September 2005, Duck was released to the community named in his pre-release recommendation. (*Id.*) Community members then held meetings protesting the place-ment. (*Id.* ¶ 53.) Burdi appeared at a community meeting and told the audience that plaintiff had investigated Duck's placement and approved it as appropriate. (*Id.* ¶ 55.) According to plaintiff, Burdi "lied to community members in telling them that [she] had approved Duck's placement in the community." (*Id.* ¶ 58.) Burdi also told several community members that plaintiff was a single parent with two young children, which statements "revealed personal information about plaintiff's family, potentially jeopardizing her safety." (Segal–Belgrave Aff. ¶¶ 6–7.)

According to plaintiff, who cites the affidavit of Jill Segal–Belgrave ("Segal–Belgrave"), a teacher from the local school district, "[i]t is common knowledge in law enforcement that personal information about a peace officer, no matter how innocent, should never be revealed." (Pl. R.56.1 Stmt. ¶ 58, citing Segal–Belgrave Aff. ¶ 7.) Segal–Belgrave wrote a letter to DOP complaining about "Burdi's handling of this situation, his dismissive conduct toward the parents who were concerned about protecting their community and his false statements about [plaintiff]." (Segal–Belgrave Aff. ¶¶ 9, 11.) DOP never responded to the letter. (*Id.* ¶ 12.)

### H. Plaintiff's SDHR Hearing

According to defendants, in June 2006, a hearing was held before an SDHR officer regarding plaintiff's SDHR complaint.[16] (Defs.R. 56.1 Stmt. ¶ 47.) Burdi, Bush, Fairchild and plaintiff were all present. (*Id.*) Plaintiff contends that she had asked William Noonan ("Noonan"), her "PEF Field Representative," to assist her, but the SDHR investigator would not allow Noonan in the conference room. (Pl.R.

---

**16.** Plaintiff admits that "there was a fact-finding meeting conducted by SDHR on June 13, 2006," but she contends that such meeting was not a "hearing." (Pl. Resp. R. 56.1 Stmt. ¶ 47.) However, plaintiff does not ex-plain why she believes the meeting was not also a hearing, as defendants so describe it, nor does she direct the Court to any citation in the record to support her assertion.

56.1 Stmt, ¶¶ 78–79.) Bush first learned that plaintiff had filed an SDHR complaint when he received a notice requiring his attendance at the hearing. (Defs. R. 56.1 Stmt. ¶ 20.)

Plaintiff contends that after she made her complaints to OPR and SDHR, "defendants commenced a pattern of retaliatory acts to discredit and punish her," citing her own sworn testimony. (Pl. R.56.1 Stmt. ¶ 61.)

## I. *Supervision Under SPO Fairchild*

Fairchild supervised plaintiff from January 2006 to September 21, 2006, at which time plaintiff was transferred to the supervision of Graham. (Defs. R. 56.1 Stmt. ¶ 36.) Fairchild counseled plaintiff verbally and in writing for various problems with "case management mechanics,"[17] including, what defendants contend were, plaintiff's "erratic work schedule, unknown whereabouts, travel vouchers and unauthorized overtime."[18] (*Id.* ¶ 38.) Plaintiff contends that she was "frequently singled out for criticism of the types of behavior that management tolerated in males," citing Jones's statement that he observed plaintiff being criticized "for being loud and argumentative, for writing comprehensive reports, changing work schedules, for working split shifts." (Pl.R. 56.1 Stmt. ¶ 31; Jones Aff. ¶ 15.)

Plaintiff avers that, from January 2006 until the hearing[19] in June 2006, her relationship with Fairchild was "friendly and collegial!" and that Fairchild considered plaintiff "a good [p]arole [o]fficer." (Pl.R. 56.1 Stmt. ¶ 77.) During the hearing, Fairchild testified favorably about plaintiff's qualifications as a parole officer. (*Id.* ¶ 82.) Immediately after the hearing, plaintiff discovered that Bush and Graham "were telling [plaintiff's] colleagues that she had 'lost the hearing' and that she was mentally unstable." (*Id.* ¶ 83.) The next day, Fairchild told plaintiff to take an extended leave or "Bush would recommend [a] § 72 psychiatric examination."[20] (*Id.* ¶ 84; Flynn Aff. ¶ 37.) Fairchild told plaintiff that she was "feeling pressure from Bush" after the hearing. (Pl. R. 56.1 Stmt. ¶ 85.)

According to plaintiff, "[t]hereafter, Fairchild changed her manner of supervising plaintiff, berating and harassing her by writing her up for action that was previously permitted." (*Id.* ¶ 86.) Plaintiff attests that Fairchild "refused to speak with [her]" when she called Fairchild; that Fairchild "began to remove [her] from cases for no reason, forbade her from working in the field, assigned her work to other [p]arole [o]fficers, refused to meet with her and yelled at her in a threatening and intimidating manner." (*Id.*, ¶¶ 87–88.)

According to plaintiff, a meeting was arranged to be held on August 23, 2006 between plaintiff, Noonan, Bush and Fairchild "to address retaliatory supervision by Bush and Fairchild," however, it was adjourned when Fairchild failed to appear.

---

**17.** Plaintiff admits this "only to the extent that ... Fairchild used these issues to retaliate against plaintiff." (Pl. Resp. R. 56.1 Stmt. ¶ 38.)

**18.** Plaintiff admits this "only to the extent that ... Fairchild used these issues to retaliate against plaintiff." (Pl. Resp. R. 56.1 Stmt. ¶ 38.)

**19.** Plaintiff refers to this as a "fact-finding conference." (*See, e.g.,* Pl. R. 56.1 Stmt. ¶ 78.)

**20.** "Section 72 permits a civil service employer who believes an employee cannot perform his or her job duties because of a disability to require such employee to undergo medical examination by a medical examiner selected by the civil service department or municipal commission." *Caruso v. Camilleri,* 2008 WL 170321, at *5 n. 3 (W.D.N.Y. Jan.15, 2008).

(Noonan Aff. ¶ 6.) On September 11, 2006, plaintiff complained to Bush that Fairchild "harassed and berated her 'non-stop' during work hours." (Pl. R.56.1 Stmt. ¶ 90.)

### J. The Letter Incident

On September 15, 2006, plaintiff took personal leave to attend to a family crisis. (*Id.* ¶ 91.) While plaintiff was on leave, Bush directed Fairchild to deliver a letter to plaintiff's home. (*Id.* ¶ 92.) According to plaintiff, "Bush made [the] arrangement although he knew about the confrontational relationship between Fairchild and plaintiff." (*Id.* ¶ 94.) Bush testified that "[a]t that point in time, [plaintiff] was quite volatile in the office with frequent yelling and screaming sessions." (Ullrich Aff'm, Ex. 2 (Bush Dep. at 87:22–24).)

### K. Plaintiff's New York State Civil Service Law § 72 Examination

In the fall of 2006, Fairchild recommended that plaintiff be referred for a New York State Civil Service Law § 72 examination (" § 72 examination") to determine her fitness for duty. (Defs. R. 56.1 Stmt. ¶ 39.) This recommendation was forwarded to Burdi, who concurred and forwarded it to Albany, where Burgos made the final decision to refer plaintiff to be examined by a medical professional to determine her fitness for duty. (*Id.* ¶ 40.) In October 2006, while under Graham's supervision, plaintiff underwent the § 72 examination. (*Id.* ¶ 43.) While the results of the examination were pending, she was given the option of performing office work or using her accrued vacation time. (Graham Decl. ¶ 12.) According to Graham, "she chose the latter option initially but then she also performed office duties." (*Id.*)

In December 2006, plaintiff was found to be "fit for duty" and she promptly resumed her caseload duties. (Defs. R. 56.1 Stmt. ¶ 43; Graham Decl. ¶ 12.) She was never suspended and, according to Burgos, she "did not lose any compensation, vacation, or other benefits associated with her parole officer status" during the period in which the results of her examination were pending. (Defs. R. 56.1 Stmt. ¶ 44; Burgos Decl. ¶ 11.) [21] However, plaintiff contends that the fact that she had been referred for the examination "was common knowledge throughout the law enforcement community in Orange County as well as in social and community agencies," and her "professional reputation and credibility were ... undermined." (Pl. R. 56.1 Stmt, ¶ 109.)

In October 2006, while plaintiff was under Graham's supervision, plaintiff wrote memos "detailing her increasing concern about DOP's inappropriate action toward her, including attempts to send Fairchild to her home unnecessarily, removal from her position as [SOU][p]arole [o]fficer and retaliatory treatment by management." (*Id.* ¶ 102.) In addition, she requested that Fairchild, "whom she knew to have suffered mental illness in the past, be barred from coming to her home." (*Id.*) Fairchild testified that "it was discussed with ... seniors in the office and with a lot of other people that [plaintiff] ha[d] essentially asked for an Order of Protection against ... Fairchild because [Fairchild] is so deranged that she is going to, in fact, kill her or her children." (Ullrich Aff'm, Ex. 4 (Fairchild Dep. 161:19–162:4).)

### L. Supervision Under SPO Graham

Graham supervised plaintiff from September 21, 2006 until May 6, 2008.[22]

---

**21.** It is unclear from the record whether plaintiff used any vacation time while the results of the § 72 examination were pending. (*Compare* Graham Decl. ¶ 12 *with* Burgos Decl. ¶ 11.)

**22.** Plaintiff adds that management knew that there existed hostility between herself and

(Defs. R. 56.1 Stmt, ¶ 41.) During this period, Graham counseled plaintiff verbally and in writing on several occasions about plaintiff's work performance, which, according to defendants, was characterized by "irregular work hours, not getting overtime pre-approved, [and] late flight plans, time sheets, community preps, and [CMS] entries." [23] (*Id.* ¶ 42.) However, plaintiff contends that "[t]hroughout 2007 and most of 2008, . . . Graham falsely accused [her] of inadequate productivity, failing to submit work schedules on time, failing to make CMS entries and untimely Community Prep reports." (Pl. R. 56.1 Stmt. ¶ 110.) For example, one morning Graham accused plaintiff of making only one CMS entry in a four-hour period although she had made over 70 entries that morning. (*Id.* ¶ 111.)

On one occasion, in 2007, Graham "improperly restricted plaintiff from working both in the field and in the office on the same day, an order that makes it impossible for a [p]arole [o]fficer to properly perform her job." (*Id.* ¶ 112.) Plaintiff adds that "[n]o other [p]arole [o]fficer in the Peekskill Area Office was so restricted." (*Id.*) Plaintiff contends that while she was supervised by Graham, she was prohibited from working on weekends or late at night, while other parole officers had no such restrictions. (*Id.* ¶ 113.) Graham also "repeatedly" failed to make CMS entries approving plaintiff's "Community Prep investigations" [24]; Graham would then accuse plaintiff of "late Community Preps." (*Id.* ¶ 114.) Furthermore, Graham "repeatedly" required plaintiff to attend what Jones describes as "unnecessary and time-consuming meetings in [Graham's] office." (*Id.* ¶ 115.)

In response to Graham's allegations that plaintiff's productivity was "inadequate," Jones "compared plaintiff's records to those of other [p]arole [o]fficers in the unit for a three-month period in summer and fall [of] 2007." (*Id.* ¶ 116.) He found that plaintiff "was routinely in 100% compliance with respect to home visits, office reports, program visits and 'other' contacts," and that "[t]he records also revealed that plaintiff routinely made timely entries into the CMS system." (*Id.*) Jones' research also revealed that other parole officers "were often two or more weeks late in their CMS entries." (*Id.* ¶ 117.)

Graham required all of her "unit members" to call in to her at the beginning and end of each shift; however, while Graham allowed other unit members to leave a voicemail message if she did not answer her phone, Graham required plaintiff to speak directly with her or another supervisor. (*Id.* ¶ 118.)

Around January 2008, "as Shop Steward, Jones . . . participated in grievance procedures concerning Graham's failure to reassign cases to plaintiff when she reassigned cases to all other [p]arole [o]fficers in her unit," which practice "deprived plaintiff of overtime." (*Id.* ¶ 119.) Jones was also "involved in [a] series of grievances with respect to Graham and Bush's failure to pay plaintiff's overtime from January 25, 2007 to August 8, 2007." (*Id.* ¶ 120.) According to Jones, all unit members other than plaintiff "received their proper overtime payments for that period.

---

Graham's husband, parole officer William Graham. (Pl. R. 56.1 Stmt. ¶ 101.)

**23.** Plaintiff admits this, but "only to the extent that Graham's supervision was largely retaliatory." (Pl. Resp. R. 56.1 Stmt. ¶ 42.)

**24.** Until the summer of 2007, parole officers were required to have their SPOs approve their Community Prep investigations. (Pl. R. 56.1 Stmt. ¶ 114.)

Plaintiff's lack of payment was due to Graham's failure to submit plaintiff's overtime forms to Bush for some eight months." (*Id.*)

Plaintiff contends that Graham also selectively enforced rules regarding the formal procedure for obtaining arrest warrants. (*Id.* ¶¶ 121–24.) According to Jones, when other members of plaintiff's unit requested an arrest warrant, Graham issued the warrant immediately, thereby circumventing the formal procedure for obtaining a warrant. (*Id.* ¶¶ 121–22.) Jones contends that, beginning in June 2007, "without explanation, Graham required plaintiff to first submit the required paperwork to the department typist and wait for it to be typed and approved by [Jones] before issuing a warrant." (*Id.* ¶ 122.) According to plaintiff, "[w]hile this procedure is actually [DOP] policy, it is never followed because of the undue delay it causes in apprehending parole violators." (*Id.*) On one occasion, in 2007, plaintiff waited more than one week for a warrant. (*Id.*) Furthermore, as a result of having to wait in the office for the typing to be completed, plaintiff worked longer hours, "[h]owever, when she turned in the additional hours on her time sheet, Graham reduced them, and plaintiff was therefore not paid for them." (*Id.* ¶ 124.) No other parole officer in Graham's unit was subject to such restrictions. (*Id.* ¶ 123.)

Plaintiff contends that, at one point, "[i]n violation of DOP policy, [p]arole [o]fficer Distadio transferred two cases to plaintiff involving parolees who had tested positive for drug use.... Graham refused to counsel or discipline Distadio, telling plaintiff to 'just deal with it.'" (*Id.* ¶ 125.) Plaintiff also contends that, in November 2007, Graham, at the direction of Bush, prepared a negative performance evaluation for plain-

tiff "that was so defective it had to be withdrawn." (*Id.* ¶¶ 126–27.)

In May 2007, while plaintiff was under Graham's supervision, plaintiff was selected to be the Strict Intensive Supervision Treatment ("SIST")[25] parole officer for the Peekskill Area Office. (Defs. R. 56.1 Stmt. ¶ 48.) Burdi approved the assignment. (Burdi Decl. ¶ 17.)

On January 3, 2008, plaintiff met with Burdi, Noonan, Jones and a Deputy Regional Director and a representative from HR to discuss her complaints; however, the meeting ended with no resolution. (Pl. R. 56.1 Stmt, ¶¶ 129, 131.)

**M. *This Lawsuit is Filed***

As of December 23, 2008, the date of plaintiff's sworn affidavit, plaintiff was still employed as a parole officer in the Peekskill Area Office, under the supervision of SPO Edward Agrisani. (Flynn Aff. ¶¶ 53–54.) Defendants contend that plaintiff "has never been disciplined by DOP. She has never been demoted. She has never been suspended. She has never lost vacation time, lost benefits or received a reduction in salary." (Defs. R. 56.1 Stmt, ¶ 50.) However, plaintiff contests this, again directing the Court to testimony that she received counseling memos, which memos "are the third step in the DOP progressive disciplinary process," and that DOP "improperly skipped the first two steps of the procedure with plaintiff." (Pl. Resp. R. 56.1 Stmt. ¶ 50; Jones Aff. ¶ 48.) On June 20, 2007, plaintiff filed the instant action.

## DISCUSSION

**I. *Legal Standard***

Summary judgment may be granted where there are no genuine issues of mate-

---

**25.** SIST officers work with parolees "who require intensive supervision." (Burdi Decl. ¶ 17.)

rial fact and the movant is entitled to judgment as a matter of law. *See* FED. R.CIV.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material only if, based on that fact, a reasonable jury could find in favor of the nonmoving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The burden rests on the movant to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding whether summary judgment is appropriate, the court resolves all ambiguities and draws all permissible factual inferences against the movant. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. To defeat summary judgment, the nonmovant must go beyond the pleadings and "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The Court's role at this stage of the litigation is not to decide issues of material fact, but to discern whether any exist. *See Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1224 (2d Cir. 1994). Nevertheless, as one court explained:

> [S]ummary judgment must be granted against a party in instances when such party fails to adequately establish an essential element on which it bears the burden of proof.... The non-moving party may not rest upon unsubstantiated allegations, conclusory assertions or mere denials of the adverse party's pleading, but must set forth and establish specific facts showing that there is a genuine issue for trial.... A metaphysical or other whimsical doubt concerning a material fact does not establish a genuine issue necessitating a trial.... The mere existence of a scintilla of evidence supporting the non-movant's case is in-

sufficient to defeat a motion for summary judgment.

*Brooks v. DiFasi*, 1997 WL 436750, at *2 (W.D.N.Y. July 30, 1997) (internal quotation marks and citations omitted).

 While summary judgment must be granted with caution in employment discrimination actions, it "remains available to reject discrimination cases lacking genuine issues of material fact." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 40 (2d Cir.1994). Thus, "even in the discrimination context, a plaintiff must prove more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997); *see also Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible.").

## II. *Timeliness of the Claims*

 Title VII "precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). Under Title VII, a claimant who has already filed a charge with a state or local agency must file discrimination charges with the EEOC within 300 days of the alleged act of discrimination. *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir.1998) (citing 42 U.S.C § 2000e–5(e)(1)). The statute of limitations on federal claims brought under § 1983 is three years for claims arising in New York. *Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir.1994).

Here, plaintiff filed her complaint with the SDHR and the EEOC on August 31, 2005 and, thus, the limitations period for

her Title VII claims runs to November 4, 2004 (300 days before August 31, 2005). Plaintiff filed her Complaint in the instant action on June 20, 2007 and, thus, the limitations period for her § 1983 claim runs to June 20, 2004 (three years before June 20, 2007). The following two claims of discrimination arise from events that took place before November 4, 2004 and June 20, 2004: (1) plaintiff's claim that Burdi transferred cases from her after parolees lodged complaints about her, between 2000 and 2003; and (2) plaintiff's claim that Burdi transferred cases from her after Briggs accused her of racism without first investigating that accusation, in 2003.[26]

Defendants argue that "to the extent that plaintiff's Title VII claims are predicated upon acts alleged to have occurred more than 300 days before she filed her administrative complaint with the SDHR ... such claims are time-barred and must be dismissed" and that "all of plaintiff's Equal Protection claims against [Burdi] that precede the 3 years before the filing of the complaint ... are barred by the applicable ... statute of limitations." (Defs. Mem. Supp. Summ. J. at 5–6.) Plaintiff argues that the Court should not disregard this evidence because it "places in context the discriminatory acts that took place during the limitations period." (Pl. Mem. Opp. Summ. J. at 18.)

■ We accept both arguments, for different reasons. The Supreme Court has held that while "discrete discriminatory acts are not actionable if time barred, even when they are related to the acts alleged in timely filed charges," Title VII does not "bar an employee from using the prior acts as background evidence in support of a timely claim." *Morgan*, 536 U.S. at 113,

122 S.Ct. 2061. The Second Circuit has interpreted this holding to apply to § 1983 claims as well. *Glynn v. County of Suffolk*, 50 Fed.Appx. 58, 58–59 (2d Cir.2002) (directing district court to reconsider plaintiff's § 1983 claims in light of *Morgan*). Accordingly, each of plaintiff's Title VII disparate treatment claims and retaliation claims that are based on conduct that occurred prior to November 4, 2004 and each of plaintiff's § 1983 claims that are based on conduct that occurred before June 20, 2004, are time barred under the relevant statutes of limitations and will not be considered as bases of liability. However, such conduct may be considered as "background evidence" in support of plaintiff's timely claims. *Morgan*, 536 U.S. at 113, 122 S.Ct. 2061.

### III. *Disparate Treatment Claim*

■ Title VII makes it unlawful "for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1). Title VII discrimination claims are analyzed under the *McDonnell Douglas* burden-shifting framework set forth by the Supreme Court, pursuant to which a plaintiff must first make a *prima facie* showing of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). A plaintiff sets forth a *prima facie* case by establishing that: (1) she belonged to a protected class; (2) she is qualified for the position that she held; (3) she suffered an adverse employment action; and (4) the adverse employment action gave rise to an inference of discrimination. *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir.2008). At the

---

**26.** We note that plaintiff has failed to provide dates for many of her allegations. However, we view the evidence in the light most favorable to the non-moving party, here plaintiff,

as we must on a motion for summary judgment. *Matsushita Elec. Indus.*, 475 U.S. at 587, 106 S.Ct. 1348.

summary judgment stage, under the *McDonnell Douglas* framework, plaintiff's burden on her *prima facie* case is *de minimus*. *Dister v. Cont'l Group Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988).

 If a plaintiff sets forth a *prima facie* case of discrimination, a presumption of discrimination arises and the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory basis for its actions. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. However, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089. Therefore, if the defendant carries its burden of production, then the presumption of discrimination raised by the plaintiff's *prima facie* case is rebutted and the plaintiff must establish, by a preponderance of the evidence, that the defendant's proffered, non-discriminatory rationale is merely a pretext for discrimination. *Id.*

 Defendants characterize plaintiff's disparate treatment claim as based on three occurrences: (1) defendants' decision to reassign plaintiff from the SOU parole officer position; (2) defendants' decision to remove plaintiff from the Task Force; and (3) defendants' decision to refer plaintiff for the § 72 examination to determine her fitness for duty. (Defs. Mem. Supp. Summ. J. at 6.) After reviewing the Complaint and plaintiff's opposition papers to this motion, we discern two other timely claims upon which plaintiff appears to base her disparate treatment claim: her claim that Burdi "mislead [sic] the public about her decision concerning [John Duck] and revealed her personal information to the public," and her claim that DOP withheld from her the results of the OPR investigation "for years," until May 2007.[27] (Pl. Mem. Opp. Summ. J. at 19–21 (discussing the "adverse employment actions" that form the basis of plaintiff's disparate treatment claim).) Finally, plaintiff does not argue that defendants' decision to refer her to a § 72 examination constituted a basis of liability for her disparate treatment claim. (*Id.*) Therefore, we assume

---

**27.** Plaintiff also appears to argue that DOP's EEO office's failure to investigate her complaints of gender discrimination constituted actionable conduct under Title VII. (Pl. Mem. Opp. Summ. J. at 19.) However, plaintiff did not allege in her Complaint defendants' failure to investigate her complaints as a grounds for liability. It is improper for a court, on a motion for summary judgment, to consider new claims that were not pleaded in the complaint. *Alali v. DeBara*, 2008 WL 4700431, at *3 n. 6 (S.D.N.Y. Oct.24, 2008.) Therefore, we will not consider plaintiff's argument here.

In addition, plaintiff argues that "[a] campaign of harassment after the plaintiff engages in protected activity may ... rise to the level of an adverse employment action," citing *Bernheim v. Litt*, 79 F.3d 318, 325–26 (2d Cir.1996). (Pl. Mem. Opp. Summ. J. at 19.) First, it is unclear whether plaintiff contends that she herself was subject to a "campaign of harassment," as she does not discuss how the facts of her case might amount to a "campaign of harassment." Second, it appears that the proposition refers to a standard for a *retaliation* claim, not a disparate treatment claim, because it states *"after the plaintiff engages in protected activity."* Third, plaintiff's citation of *Bernheim* is misplaced, as that court analyzed a First Amendment retaliation claim and not a Title VII disparate treatment claim, and the court also specifically limited its holding to the procedural context of a 12(b)(6) motion to dismiss. 79 F.3d at 326 (Declining to "prune" complaint at pleading stage by making determination regarding each allegation within a cause of action that is legally cognizable when viewed in its totality, because the "elimination of non-constitutional claims is more appropriately undertaken ... at a later stage of the proceedings, namely upon review of motions pursuant to Rule 56.").

that she does not ground this claim upon that occurrence. Furthermore, plaintiff's time-barred claims, as discussed above, will not be considered here as bases for liability. Therefore, we turn now to the question of whether defendants are entitled to summary judgment on plaintiff's disparate treatment claim based on any of the following occurrences: (1) plaintiff's transfer from the SOU parole officer position; (2) plaintiff's removal from the Task Force; (3) Burdi's handling of the John Duck Incident; and (4) DOP's withholding of the results of the OPR investigation.

### A. Plaintiff's Transfer From the SOU Parole Officer Position [28]

█ As described above, the legal standard for a disparate treatment claim requires plaintiff to first set forth a *prima facie* case by establishing that: (1) she belonged to a protected class; (2) she is qualified for the position that she held; (3) she suffered an adverse employment action; and (4) the adverse employment action gave rise to an inference of discrimination. *Mathirampuzha*, 548 F.3d at 78. For purposes of a disparate treatment claim, "[a] plaintiff sustains an adverse employment action if ... she endures a *materially adverse change in the terms and conditions of employment.*" *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636,

640 (2d Cir.2000) (internal quotation marks and citation omitted). A materially adverse change in employment "include[s] discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir.1999). It "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Galabya*, 202 F.3d at 640 (internal quotation marks and citation omitted).

█ In this case, plaintiff argues that her removal from the position as the SOU parole officer constitutes an adverse action by defendants "because this was a prestigious and important appointment." [29] (Pl. Mem. Opp. Summ. J. at 20.) It is undisputed that there is no difference in the salary or rank of the SOU parole officer position compared to a non-special parole officer position. For a plaintiff to establish that a lateral transfer—one that does not involve a change in salary or rank—constitutes an adverse employment action, "the plaintiff must show that the transfer created a 'materially significant disadvantage.'" *Galabya*, 202 F.3d at 641 (internal citation omitted). Although a "transfer from an 'elite' unit to a 'less prestigious' unit could constitute an adverse employment action," a plaintiff cannot rely on her own opinion of the difference in prestige

---

**28.** Defendants note, correctly, that plaintiff does not refer to her removal as the SOU parole officer in her Complaint. (Defs. Mem. Supp. Summ. J. at 8.) As noted above, generally, courts will not consider, on a motion for summary judgment, allegations that were not pleaded in the Complaint and raised for the first time in opposition to a motion for summary judgment. *Alali*, 2008 WL 4700431, *3 n. 6. However, plaintiff does allege in the Complaint that she was "transferred [to] the Sex Offender Case Load" and became a member of the Task Force, and that she was subsequently removed from the Task Force. (Complt.¶¶ 19, 26.) She also alleges, broadly, that she was subjected to "lost promotional opportunities." (*Id.* ¶ 33.) And, defendants

note that plaintiff testified at her deposition that she regarded her removal from the position as disparate treatment by Bush, and, therefore, they discuss the incident in their moving papers of this motion. Therefore, reading the Complaint liberally, and because we see no prejudice to defendants, we consider this allegation.

**29.** It is unclear from plaintiff's sentence whether the term "prestigious and important appointment" refers to the SOU parole officer position or to the position on the Task Force. (*See* Pl. Mem. Opp. Summ. J. at 20.) We infer that plaintiff intends the term to refer to each.

levels to withstand a motion for summary judgment. *Dillon v. Morano*, 497 F.3d 247, 254–55 (2d Cir.2007) (In a First Amendment retaliation claim case, in which a plaintiff must meet a standard that is less demanding than in Title VII cases, transfer from one unit to another was not an adverse action.).

■ Plaintiff asserts that SOU "assignments are often a road to promotion" and that her transfer back to a position with a mixed caseload was viewed by her colleagues and community as a demotion, but she cites only her own sworn statements to support these propositions. (Pl. Resp. R. 56.1 Stmt. ¶ 18; Pl. R. 56.1 Stmt. ¶ 98.) Therefore, we conclude that plaintiff has not created a genuine issue of fact as to whether her transfer from the SOU parole officer position to that of a parole officer with a mixed caseload created a "materially significant disadvantage" for her. She has set forth no evidence that the transfer caused her to lose a promotion that she would have received had she remained in the SOU parole officer position or that other officers in the SOU parole officer position have been promoted more frequently than non-SOU parole officers. Nor has she demonstrated that she has unique qualifications that render her better suited for the SOU parole officer position than other parole officers in the Peekskill Area Office. *Cf. Rodriguez v. Bd. of Educ. of Eastchester Union Free Sch. Dist.*, 620 F.2d 362, 366 (2d. Cir. 1980) (Involuntary transfer of art teacher from junior high school to elementary school students constituted adverse employment action because the "evidence indicated that the art programs at the elementary level were so profoundly different from those in the junior high school as to render utterly useless her twenty years of experience and study in developing art programs for middle school children.") Nor is plaintiff's conclusory allegation, based on her own opinion, that the trans-fer was "viewed as a demotion" sufficient to create a genuine issue of fact. Therefore, defendants are entitled to judgment as a matter of law that plaintiff's transfer from the SOU parole officer position was not an adverse employment action for purposes of her disparate treatment claim.

## B. *Plaintiff's Removal From the Task Force*

■ Plaintiff also argues that defendants' decision to remove her from the Task Force constitutes an adverse action "because [the position on the Task Force] was a prestigious and important appointment." (Pl. Mem. Opp. Summ. J. at 20.) Plaintiff has not raised a genuine issue of material fact that her transfer from the Task Force constituted "a materially adverse change in the terms and conditions of employment." *Galabya*, 202 F.3d at 640. The Task Force met only once each month. Plaintiff's exclusion from the monthly meetings can hardly be described as a material change in the terms or conditions of her employment. *See Dillon*, 497 F.3d at 250, 254 (Plaintiff's exclusion from certain meetings of "top staff and administrative personnel" that plaintiff had previously attended did not constitute adverse employment action.).

Furthermore, the undisputed facts indicate that plaintiff's removal from the Task Force did not result in a loss of salary or a demotion in rank. (*See* PL.Mem. Opp. Summ. J. at 20.) Plaintiff states that, according to the OPR report, Bush and McKeon thought that she should be restored to the Task Force and that McKeon believed that the transfer would "[a]ffect her career path when she leaves [DOP]." (Flynn Aff., Ex. 3 at 1773.) A transfer to a position with fewer promotional opportunities may be considered an adverse employment action. *See Rodriguez*, 620 F.2d at 365. However, we are not satisfied that

plaintiff raises a genuine issue of fact as to whether the transfer from the Task Force would, in fact, likely affect her career prospects should she leave DOP. She does not establish that McKeon had the requisite knowledge to testify as to this issue in the OPR report and, therefore, his opinion must be treated as mere speculation. *See Stroud v. New York City,* 374 F.Supp.2d 341, 349 (S.D.N.Y.2005) (quoting *Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004)) (On a motion for summary judgment "the nonmoving party 'may not rely on mere conclusory allegations or speculation, but instead must offer some hard evidence' in support of its factual assertions."). Nor has plaintiff presented any data or "affidavits and testimony demonstrating that the transfer was, in effect, a demotion that would constitute a serious professional setback and stigma to her career." *Rodriguez,* 620 F.2d at 365. Therefore, defendants are entitled to judgment as a matter of law that plaintiff's transfer from the Task Force was not an adverse employment action and, thus, cannot be the grounds for her disparate treatment claim.

### C. *Burdi's Handling of the John Duck Incident*

■ Plaintiff argues that Burdi's misleading public statements regarding plaintiff's role in the decision concerning sex offender John Duck and Burdi's disclosure of personal information about plaintiff to the public, which violated DOP policy, constituted adverse employment actions. (Pl. Mem. Opp. Summ. J. at 20.) However, plaintiff does not explain how Burdi's conduct constitutes "a materially adverse change in the terms and conditions of [plaintiff's] employment." *Galabya,* 202 F.3d at 640. She does not cite, and the Court's research has not revealed, any legal authority that supports the proposition that lying about an employee to the public or failing to defend an employee before the public constitutes an adverse employment action under Title VII. Plaintiff also contends that "[i]t is common knowledge in law enforcement that personal information about a peace officer ... should never be revealed," and directs the court to the sworn testimony of a teacher, Segal–Belgrave, who stated that Burdi's statements about plaintiff's family "violat[ed] ... DOP policy" and "potentially jeopardiz[ed] [plaintiff's] safety." (Pl. R. 56.1 Stmt. ¶ 58; Segal–Belgrave Aff. ¶¶ 6–7.) However, plaintiff has failed to support her contention that it is commonly known that personal information about peace officers should not be revealed with any citation to the record. Plaintiff also has failed to establish that Segal–Belgrave has any personal knowledge of DOP's safety precautions or that she is qualified to testify to the effect of Burdi's statements on plaintiff's safety and, therefore, her opinion must be treated as mere speculation. FED.R.CIV.P. 56(e) (affidavits submitted in opposition to a motion for summary judgment "must be made on personal knowledge ... and show that the affiant is competent to testify on the matters stated.") Therefore, summary judgment is appropriate with regard to plaintiff's disparate treatment claim, to the extent that it relies on Burdi's handling of the John Duck Incident.

### D. *DOP's Withholding of the OPR Report*

■ Plaintiff argues that "DOP withheld from plaintiff the results of the only investigation it did conduct, one whose outcome validated plaintiff's complaints." (Pl. Mem. Opp. Summ. J. at 19.) Defendants contend that plaintiff "misconstrues the facts and substitutes her own subjective viewpoint" regarding this occurrence, stating that "the report had been disclosed to plaintiff in a redacted version to protect the privacy interest of non-parties."

488

(Defs. Reply Mem. Supp. Summ. J. at 5, 5 n.1.) Defendants appear to argue that plaintiff's delay in receiving the report was due to the sensitive nature of the information therein and the need to obtain this Court's involvement before producing the document. Regardless of the reason that plaintiff did not receive the report in a timely fashion, plaintiff does not cite, and the Court's research did not reveal, any legal authority that indicates that temporarily withholding a personnel-related report constitutes an adverse employment action. Indeed, we do not see how withholding an investigative report could be characterized as "a materially adverse change in the terms and conditions of employment." *Galabya*, 202 F.3d at 640.

### E. *Summary*

■ Defendants are entitled to summary judgment with respect to plaintiff's Title VII disparate treatment claim because none of the timely claims upon which plaintiff relies in making this claim constitute adverse employment actions under Title VII. Furthermore, except for certain differences not applicable here, "the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981 or the Equal Protection Clause." *Patterson*, 375 F.3d at 225. Therefore, summary judgment must be granted with respect to plaintiff's § 1983 claim as well. *See id.* ("[T]he factors justifying summary judgment dismissing [plaintiff's] Title VII claim against the municipal defendants for termination of his employment equally support the summary dismissal of his claims for termination brought under ... § 1981.").

### IV. *Retaliation Claim*

■ Plaintiff contends that DOP subjected her to retaliation, "including creation of a hostile work environment, loss of overtime, suspension, micromanagement, lost promotional opportunities and denigration of her reputation and credibility." [30] (Complt.¶ 33.) Title VII prohibits retaliation against an employee "because [such employee] has opposed any practice made an unlawful employment practice ... under [Title VII]." 42 U.S.C.2000e–3(a). "The *McDonnell Douglas* burden shifting analysis used in claims of discrimination in violation of Title VII also applies to retaliation claims brought pursuant to Title VII." *Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir.2003). To establish a *prima facie* case of retaliation, a plaintiff must prove: (1) that she was engaged in protected activity by opposing a practice made unlawful by Title VII; (2) that the employer was aware of that activity; (3) that the employer took an adverse employment action against the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse action. *McMenemy v. City of Rochester*, 241 F.3d 279, 282–83 (2d Cir.2001).

■ If the plaintiff sets out a *prima facie* case, then the burden of production shifts to the defendant to articulate a legitimate, non-retaliatory rationale for its actions. *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir.1991). If the defendant proffers a legitimate, non-retaliatory reason, the burden of production shifts back to the plaintiff to introduce evidence that the defendant's reason was a pretext for retaliation. *Id.* The burden of proof and persuasion remains at all times with the plaintiff.

---

**30.** We note that in plaintiff's opposition papers to this motion, she asserts that both DOP and Burdi retaliated against her. (*See, e.g.,* Pl. Mem. Opp. Summ. J. at 8.) However, because she did not allege her retaliation claim against Burdi in the Complaint, she cannot now bring a claim for retaliation against him in her opposition to this motion for summary judgment. *Alali*, 2008 WL 4700431, at *3 n. 6.

*Milano v. Astrue,* 2008 WL 4410131, at *27 (S.D.N.Y. Sept.26, 2008).

■ In this case, defendants do not dispute that plaintiff has satisfied the first two elements of a *prima facie* case of Title VII retaliation: that she engaged in protected activity and that DOP was aware of that activity. (*See* Defs. Mem. Supp. Summ. J. at 14–18.) Plaintiff engaged in activity protected by Title VII when she complained about gender discrimination informally, via a series of memos to Burdi and OPR in April and July of 2005, and formally, when she filed her complaint with the SDHR on August 31, 2005, and during the SDHR hearing in June 2006.[31] *See Amin v. Akzo Nobel Chems., Inc.,* 282 Fed.Appx. 958, 961 (2d Cir.2008) ("Informal complaints to management as to discrimination on a basis prohibited by Title VII are prohibited activity.") She also engaged in protected activity when she: (1) attempted to meet with Fairchild and Bush on August 23, 2006, to discuss their allegedly retaliatory supervision of her; (2) complained to Bush about Fairchild's treatment of her on September 11, 2006; and (3) complained of retaliatory treatment in her memos of October 2006. *See Lindner v. Int'l Bus. Machs., Corp.,* 2008 WL 2461934, at *6 (S.D.N.Y. June 18, 2008) (finding that plaintiff's *request* for meeting with EEOC counselor constituted

protected activity); *Martinez v. N.Y. City Dep't of Educ.,* 2008 WL 2220638, at *11 (S.D.N.Y. May 27, 2008) (recognizing that complaints of retaliation for protected activity constituted protected activity themselves). Further, DOP knew about plaintiff's complaints. *See Patane v. Clark,* 508 F.3d 106, 115 (2d Cir.2007) (to satisfy knowledge requirement, "general corporate knowledge" is sufficient). Thus, the first two elements of a *prima facie* case of retaliation are met here.

Plaintiff contends that, after making complaints about gender discrimination, DOP subjected her to various adverse actions. (Pl. Mem. Opp. Summ. J. at 22.) Although it is not clear from plaintiff's Complaint or from her opposition to the instant motion the specific incidents on which she bases her retaliation claim, after reviewing the facts in the light most favorable to her, it appears that she relies on the following: (1) her claim that Burdi mishandled the John Duck Incident, in September 2005; (2) her claim that she was improperly transferred from the SOU parole officer position, in September 2006; (3) her claims regarding Fairchild's supervision of her from January 2006 to September 2006; (4) her claim that she was subjected to a § 72 examination in the fall of 2006; and (5) her claims regarding Graham's supervision of her from September 2006 to May 2008.[32]

---

31. We note that a complaint of discrimination need not describe conduct that actually amounts to a violation of Title VII in order to constitute protected activity. *Quinn,* 159 F.3d at 769. So long as the plaintiff had a *"good faith, reasonable belief"* that the underlying challenged actions of the employer violated the law," the complaint is a protected activity. *Id.* (emphasis in original; internal quotation marks and citation omitted). Although, as discussed above, plaintiff has failed to adduce facts sufficient to establish DOP's liability for her disparate treatment claim, DOP does not dispute that plaintiff had a good faith, reasonable belief that she was being subjected to disparate treatment because of her gender.

32. Plaintiff argues in her opposition papers that the September 2005 counseling memo constitutes a retaliatory act, however, she did not plead facts in her Complaint regarding this memo, nor did she plead that DOP made false accusations against her. (Pl. Mem. Opp. Summ. J. at 22; *see generally* Complt.) She raises this claim for the first time in her opposition papers to the instant motion. Therefore, we will not consider this claim as a basis for liability here. *Alali,* 2008 WL 4700431, at *3 n. 6. Likewise, we also will not consider the Letter Incident or plaintiff's claim that OPR failed to investigate her gender discrimination complaint as bases for liability, as she did not plead any facts regarding these incidents in the Complaint, and instead

## A. *The John Duck Incident*

The purpose of the Title VII anti-retaliation provision is to prohibit employer actions that would deter a reasonable employee from reporting discriminatory behavior. *Kessler v. Westchester County Dep't of Soc. Sevs.*, 461 F.3d 199, 208 (2d Cir.2006). Therefore, "the anti-retaliation provision of Title VII, unlike Title VII's substantive provision, is *not* limited to discriminatory actions that affect the terms and conditions of employment." *Id.*, at 207 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)) (alterations and quotation marks omitted; emphasis in original). Rather, to prevail on a claim for retaliation under Title VII, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (internal quotation marks and citation omitted.) Thus, the standard that the plaintiff must meet is lower for a retaliation claim than for a disparate treatment claim. However, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience" because such actions have no legally cognizable deterrent effect. *White*, 548 U.S. at 68, 126 S.Ct. 2405. The standard is objective; whether a particular action is materially adverse "depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id.* at 71, 126 S.Ct. 2405 (internal quotation marks and citation omitted).

Plaintiff argues that the John Duck Incident, in September 2005, during which Burdi misled members of the public regarding plaintiff's role in Duck's placement in their community and revealed personal information about her, constituted a retaliatory adverse employment action. She contends that Burdi, by making these statements, discredited her in the community and potentially compromised her safety.[33] (Pl. Mem. Opp. Summ. J. at 22; Pl. R. 56.1 Stmt. ¶ 57.) Whether or not plaintiff's contentions are true, a jury could find that it was reasonable for plaintiff, a female parole officer working in the field with convicted sex offenders, to *believe* that Burdi's actions undermined her reputation and jeopardized her safety. Such conduct cannot reasonably be characterized as a "petty slight" or "minor annoyance." *White*, 548 U.S. at 68, 126 S.Ct. 2405. We cannot hold, as a matter of law, that a reasonable employee in plaintiff's situation would not be dissuaded from reporting discrimination by conduct that she believes will affect her professional reputation and endanger her safety. Therefore, plaintiff has satisfied the third prong of her *prima facie* case with regard to this incident.

We now consider whether plaintiff has met the fourth prong of her *prima facie* case, causation. "Proof of causal connection can be established *indirectly* by showing that the protected activity was

---

raises them for the first time in her opposition papers. (Pl. Mem. Opp. Summ. J. at 11.)

Furthermore, although plaintiff alleges in her Complaint that the retaliation to which she alleges to have been subjected included "suspension" and "lost promotion opportunities," nothing in the record supports these claims and, therefore, we do not consider them as separate grounds for her retaliation claim. (Complt.¶ 5.)

**33.** Defendants do not specifically address whether the John Duck Incident could be the basis for a retaliation claim in their moving or reply papers.

followed closely by discriminatory treatment, ... or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, ... or *directly* through evidence of retaliatory animus directed against a plaintiff by the defendant." *DeCintio v. Westchester County Med. Ctr.*, 821 F.2d 111, 115 (2d Cir.1987) (emphasis in original; internal quotation marks and citations omitted). Plaintiff filed her complaint with the SDHR on August 31, 2005; the John Duck Incident occurred immediately thereafter, in September 2005. A reasonable jury could infer that Burdi discredited plaintiff and revealed personal information about her to the public because she had filed the complaint of discrimination, based on the temporal proximity of these events. *See, e.g., Treglia v. Town of Manlius,* 313 F.3d 713, 721 (2d Cir.2002) (one-month gap between protected activity and adverse employment action is "sufficient to establish the required causal link for a prima facie case."); *Eldaghar v. City of N.Y. Dep't of Citywide Admin. Servs.,* 2008 WL 2971467, at *12 (S.D.N.Y. July 31, 2008) (less than one month between complaint to SDHR and adverse employment action is sufficient to support finding of causal connection); *Monclova v. City of New York,* 2008 WL 822117, at *8 (E.D.N.Y. Mar.26, 2008) (one-month lapse between discrimination complaint and adverse employment action, "[o]n its own," could create inference of causation). Accordingly, we find that the evidence is sufficient to raise a genuine issue of fact as to whether there was a causal connection between the alleged adverse action suffered by plaintiff and plaintiff's complaints about gender discrimination.

As plaintiff has established a *prima facie* case of retaliation, the burden shifts to DOP to provide a legitimate, non-retaliatory reason for its actions. *Johnson,* 931 F.2d at 207. DOP has not provided any reason for, or any explanation of, Burdi's

conduct in handling the John Duck Incident. (*See generally* Defs. R. 56.1 Stmt.; Burdi Decl.) Therefore, DOP has not met its burden, and summary judgment on plaintiff's retaliation claim is inappropriate.

### B. *Plaintiff's Transfer From the SOU Parole Officer Position*

Plaintiff argues that she suffered a retaliatory adverse employment action when she was transferred from the SOU parole officer position in September 2006. (PL.Mem. Opp. Summ. J. at 22.) As discussed above, plaintiff failed to meet her burden to establish that her lateral transfer from the SOU parole officer position to a position handling a mixed caseload constitutes an adverse employment action for purposes of her disparate treatment claim. *See* Discussion, Section III.A. However, there is a genuine issue of fact as to whether plaintiff's transfer constitutes an adverse employment action for purposes of her retaliation claim, which, as discussed above, must be analyzed under the standard of whether the defendant's conduct "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Kessler,* 461 F.3d at 207.

The SOU parole officer position differs from the non-special parole officer position, in that SOU parole officers supervise only a certain type of parolee, compared to a mixed caseload, and they are responsible for a fewer number of parolees so that they can spend more time on "these special cases that are of high interest to the community and are of a sensitive nature." (Defs. R. 56.1 Stmt. ¶ 16.) Thus, when plaintiff was transferred out of the SOU parole officer position, while the terms and conditions of her employment did not change, her job responsibilities did. She was no longer responsible for supervising the cases that were of particularly high interest and "of a sensitive nature." *Id.*

We find that there is an issue of fact for the jury as to whether her responsibilities changed so much that a reasonable employee in plaintiff's position would be dissuaded from complaining of gender discrimination. *Kessler,* 461 F.3d at 207; *see id.* at 202, 209 (finding genuine issue of fact as to whether plaintiff's job reassignment, which "did not affect [his] job title, job grade ..., salary, benefits, or hours of work," but by which he was relieved of special responsibilities, could have dissuaded a reasonable employee in his position from complaining of discrimination).

██ DOP argues that, even if plaintiff's transfer was an adverse employment action, plaintiff has failed to establish that there was a causal connection between her protected activity and the transfer. (Defs. Mem. Supp. Summ. J. at 14–18.) Plaintiff, Bush and Fairchild had a meeting scheduled for August 23, 2006, to discuss plaintiff's complaints of retaliatory supervision, and plaintiff complained to Bush about such supervision by Fairchild on September 11, 2006. Plaintiff was informed that DOP was transferring her from the SOU parole officer position on September 21, 2006, ten days later. We find that a ten-day gap between the protected activity and the adverse employment action is sufficient to withstand a motion for summary judgment on the issue of causation. *Quinn,* 159 F.3d at 769 (finding that causal connection requirement was satisfied where an adverse employment action occurred less than two months after one complaint and just ten days after another). Thus, plaintiff has set forth a *prima facie* case on this claim.

██ DOP contends that it has proffered a legitimate, non-retaliatory reason for transferring plaintiff from the SOU parole officer position: "Dissatisfaction with plaintiff's work performance and her unprofessional and difficult behavior." (Defs. Mem. Supp. Summ. J. at 18.) As a

general rule, "[p]oor work performance is ... a legitimate, non-discriminatory reason for termination in the retaliation context." *Genao v. Avon Salon & Spa,* 2008 WL 190605, at *5 (S.D.N.Y. Jan.16, 2008). DOP avers that plaintiff's poor work performance formed the basis for its action, arguing that "Burdi removed [p]laintiff as the SOU parole officer and reassigned her to regular parole officer duties at the recommendation of [Bush] because Bush was not satisfied with her work performance as it pertained to the special requirements needed from a SOU parole officer." (Defs. Mem. Supp. Summ. J. at 19.) Burdi's sworn statements and DOP records indicate that DOP received complaints about plaintiff from parolees and members of the community. (Burdi Decl. ¶ 14, Ex. B.) Burdi also testified that he accepted Bush's recommendation for plaintiff's reassignment from the SOU parole officer position "based on several factors, including the large number of complaints about [her], her poor case management and the nature of the SOU parole officer position." (*Id.* ¶ 11.) In light of this, we find that DOP has met its burden to proffer a legitimate, non-retaliatory reason for transferring plaintiff from the SOU parole officer position.

██ Plaintiff does not explicitly argue that DOP's proffered reason for her transfer is pretextual. However, we are satisfied, upon a review of the record, that an issue of fact remains on the question of whether such reason was pretextual. As discussed above, plaintiff has proffered evidence suggesting a strong temporal proximity between her complaints about Fairchild's supervision of her and her subsequent transfer from the SOU parole officer position, in which position she was supervised by Fairchild, to a position with a mixed caseload and a new supervisor. In addition, much of the

evidence supporting DOP's proffered reason for transferring her—her poor work performance—was generated by individuals at DOP who, plaintiff asserts, retaliated against her, including Bush, Burdi and Burgos. *See Quinn,* 159 F.3d at 770 (whether defendant's proffered reason for firing plaintiff—"poor work performance"—was pretextual was issue of fact because of "strong temporal correlation between her complaints ... and her termination" and because "[n]early all of the record evidence supporting [defendant's] asserted non-retaliatory reason for discharge both was generated by two of [plaintiff's] alleged harassers ... and followed her initial inquiry with the DHR regarding sexual harassment.")

Furthermore, plaintiff testified that when she asked Bush for the reason for her transfer, he stated simply "because we can" rather than provide her with the legitimate non-retaliatory reason that DOP now sets forth. Construing the record most favorably to plaintiff, a reasonable fact finder could infer that Bush's failure to provide plaintiff with the allegedly non-retaliatory reason for her transfer indicates that Bush's motives were, at least in part, retaliatory. *Meckenberg v. N.Y. City Off-Track Betting,* 42 F.Supp.2d 359, 383 (S.D.N.Y.1999) (citing *Sumner v. U.S.P.S.,* 899 F.2d 203, 209 (2d Cir.1990)) ("Title VII is violated [even] if the retaliatory motive played [only] a part in the adverse action even if it was not the sole cause.").

Finally, we note that, although DOP points to a litany of problems with plaintiff's work performance,[34] DOP did not terminate her employment altogether, but rather transferred her to a position with a mixed caseload. A reasonable factfinder could question whether DOP's reason for transferring her was in fact based on her alleged poor work performance, given that plaintiff's work performance apparently was not so poor as to merit a demotion. Plaintiff was transferred to what defendants describe as a position of the same rank as the SOU parole officer position. The record does not reveal why plaintiff's work problems precluded her from competently supervising sex offender parolees but not parolees with different criminal backgrounds. Therefore, whether DOP's proffered reason for transferring plaintiff from the SOU parole officer position was a pretext for discrimination is an issue of fact for the jury. In making this determination, we are mindful that "[s]ummary judgment is generally inappropriate where questions of the defendant's state of mind area tissue." *Raia,* 2007 WL 608129, at *2. We decline to grant summary judgment on plaintiff's retaliation claim to the extent that it is based on her transfer from the SOU parole officer position.

### C. *Supervision Under Fairchild*

Plaintiff argues that she was subjected to retaliatory treatment by her supervisors, including Fairchild. (Pl. Mem. Opp. Summ. J. at 22.) With regard to Fairchild, who supervised plaintiff from January 2006 to September 21, 2006, plaintiff contends that she had a "friendly and collegial" relationship with Fairchild until the hearing in June 2006, during which Fairchild testified favorably about plaintiff, but that the day after the hearing Fairchild threatened plaintiff and told her she was "feeling pressure from Bush" after the hearing. (PL.R. 56.1 Stmt, ¶¶ 77, 82, 84, 85.) According to plaintiff, from that point on, Fairchild "changed her manner of supervising plaintiff." (*Id.* ¶ 86.) Specifical-

---

**34.** Defendants argue that "the record is replete with plaintiff's inadequacies in fulfilling DOP's basic requirements for parole officers: timely submission of flight plans, timesheets, call-ins to the supervisor, prior overtime approval and other case management issues." (Defs. Mem. Supp. Summ. J. at 20–21.)

ly, plaintiff states that Fairchild "berated" and "harassed" her by "writing her up" for action that was previously permitted; she refused to speak or meet with plaintiff; she removed plaintiff from cases "for no reason"; she forbade plaintiff from working "in the field"; she assigned plaintiff's work to other parole officers; and she yelled at plaintiff "in a threatening and intimidating manner." (*Id.* ¶¶ 86–88.) For these contentions, plaintiff relies, primarily, on her own sworn statements and personal knowledge, and we view them in the light most favorable to plaintiff, as we must on this motion for summary judgment.

DOP argues that "[m]icromanagement and increased scrutiny do not constitute adverse employment actions in the absence of other changes of employment." (Defs. Mem. Supp. Summ. J. at 15.) We acknowledge that each of the asserted actions by Fairchild, in isolation, may not be actionable. *See, e.g. Moses v. City of New York,* 2007 WL 2600859, at *2 (S.D.N.Y. Aug.28, 2007) ("[I]ncreased scrutiny does not constitute adverse action."); *Scott v. Cellco P'ship,* 2007 WL 1051687, at *2 (S.D.N.Y. Apr.3, 2007) ("[D]efendant's general reprimands about plaintiff's lateness and other accusations, and alleged excessive scrutiny of plaintiff" did not constitute adverse employment actions) (internal quotation marks and citation omitted).

■ However, when these actions are viewed collectively, a reasonable jury might find that Fairchild's sudden change in conduct toward plaintiff and her hostile manner of supervising plaintiff after plaintiff's hearing, would dissuade a reasonable employee in plaintiff's position from reporting gender discrimination. *Kessler,* 461 F.3d at 207; *see Raia,* 2007 WL 608129, at *6 (considering plaintiff's retaliatory hostile work environment claim and finding genuine issue of fact as to whether plaintiff suffered an adverse employment

action based on plaintiff's claims that defendant constantly berated him, threatened him, sent him to dangerous work locations and bestowed unwarranted reprimands on him); *Edwards v. Town of Huntington,* 2007 WL 2027913, at *10–11 (E.D.N.Y. July 11, 2007) (considering plaintiff's accusations that defendant imposed on plaintiff, but not other employees, excessive scrutiny and requirement of doctors' notes to explain absences, and that defendant withheld opportunities for overtime hours and special positions, told plaintiff "get back to work," forbade plaintiff from using a mobile phone and failed to provide plaintiff with tools provided to other employees, and holding that "a reasonable juror could find that [defendant's] actions, *particularly when considered collectively,* 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'") (emphasis added) (citing *White,* 548 U.S. at 68, 126 S.Ct. 2405.) Therefore, we find that plaintiff has established the third prong of her *prima facie* case of retaliation based on Fairchild's management of her.

■ Plaintiff has also established the fourth prong of her *prima facie* case, causation. According to plaintiff, she perceived Fairchild's shift in behavior toward her the day after plaintiff's SDHR hearing. Furthermore, plaintiff contends that Fairchild told her she was "feeling pressure from Bush" after the hearing. The temporal proximity between plaintiff's protected activity and Fairchild's change in behavior, as well as Fairchild's statement regarding "feeling pressure" from the Area Supervisor, is evidence of potential retaliation strong enough that resolution of the issue of whether Fairchild's conduct was caused by plaintiff's complaints of gender discrimination should be left for a jury.

DOP appears to proffer as a legitimate, non-retaliatory reason for Fairchild's scru-

tiny: dissatisfaction with plaintiff's performance and Fairchild's new management style, as compared to that of McKeon. (Defs. Reply Mem. Supp. Summ. J. at 13; Defs. Mem. Supp. Summ. J. at 24.) DOP relies on the testimony of Graham, Fairchild and Bush for the proposition that "the record is replete with plaintiff's inadequacies in fulfilling DOP's basic requirements for parole officers." (Defs. Mem. Supp. Summ. J. at 20.) Assuming that "poor work performance" is a legitimate reason for Fairchild's actions in supervising plaintiff, viewing the record in the light most favorable to plaintiff, a jury could find that this reason was pretextual. If the jury accepts plaintiff's account of Fairchild's treatment of her, it might reject the notion that Fairchild's conduct, which included harassing plaintiff and yelling at her in a "threatening and intimidating manner," was motivated solely by plaintiff's work performance. Furthermore, given the evidence of temporal proximity between plaintiff's protected activity and Fairchild's change in conduct and Fairchild's statement that she was "feeling pressure from Bush" after the hearing, as well as the fact that DOP relies on its own manager's statements regarding plaintiff's poor performance, a reasonable jury could conclude that Fairchild's reasons for changing her behavior were based, at least in part, on plaintiff's complaints of gender discrimination. *Quinn*, 159 F.3d at 770 (A jury could find pretext where there was strong temporal correlation between protected activity and plaintiff's discharge and where' most of the evidence supporting defendant's proffered reason was supplied by perpetrators of the adverse employment action.); *Meckenberg*, 42 F.Supp.2d

at 383 (Title VII is violated when retaliatory motive plays only a part in the adverse action, "even if it was not the sole cause.") (internal citation omitted).

### D. Plaintiff's § 72 Examination

■ Plaintiff contends that DOP retaliated against her in the fall of 2006 "by falsely advising co-workers that plaintiff was mentally unstable and maliciously directing her to a [§] 72 examination." (Pl. Mem. Opp. Summ. J. at 22.) Defendants argue that requiring an employee to submit to a § 72 examination, without more, does not constitute an adverse employment action, citing *Brady v. Dammer*, 573 F.Supp.2d 712, 724 (N.D.N.Y. Aug.13, 2008). However, *Brady* does not control here because the court in that case did not apply the current standard for adverse actions in retaliation claims, but rather applied the higher standard that is used in disparate treatment cases. 573 F.Supp.2d at 724 (considering § 72 examination's impact "on the conditions of [p]laintiff's employment").[35] Plaintiff contends that DOP's actions in requiring her to undergo the examination had "the potential to destroy the career of any law enforcement officer." (PL.Mem. Opp. Summ. J. at 22.) Without making any determination as to accuracy of plaintiff's contention, but considering plaintiff's perception of the examination by herself and her peers, we cannot hold, as a matter of law, that a reasonable employee would not be dissuaded from complaining about discrimination by the prospect of undergoing such an examination. *See Rosenblatt v. City of New York*, 2007 WL 2197835, at *7 (S.D.N.Y. July 31, 2007) (in a First Amendment retaliation

---

**35.** Likewise, defendants' reliance on *Baum v. Rockland County*, 161 Fed.Appx. 62 (2d Cir. 2005) (summary order) and *Jackson v. City University of New York*, 2006 WL 1751247 (S.D.N.Y. June 23, 2006) is similarly misplaced. Both the *Baum* court and the *Jack-* son court, like the *Brady* court, applied not the current Title VII retaliation standard for an adverse employment action, but the higher standard used for analyzing Title VII's substantive provision. *Baum*, 161 Fed.Appx. at 64; *Jackson*, 2006 WL 1751247, at *3–4.

case, declining to rule as a matter of law that a § 72 involuntary psychiatric leave is not adverse employment action, and noting "[a]ny employee of ordinary firmness would likely view such an act as bluntly and harshly as plaintiff puts it—'being suspended and labeled crazy.' ") Therefore, we find that plaintiff has satisfied the third prong of her *prima facie* case with respect to this claim.

■ DOP argues that plaintiff has failed to establish causation, noting that "the § 72 examination that she was ordered to undergo in October 2006 occurred 14 months after plaintiff's SDHR complaint." (Defs. Mem. Supp. Summ. J. at 17.) However, plaintiff also engaged in protected activity when she attempted to meet with Fairchild and Bush in August 2006 to discuss Fairchild's treatment of her, and complained to Bush about such treatment in September of 2006. Fairchild recommended plaintiff's referral for a § 72 examination in the fall of 2006, at some point on or before October 4, 2006.[36] Given this temporal proximity—less than one month—between plaintiff's complaint and Fairchild's recommendation that plaintiff undergo the § 72 examination, we cannot hold, as a matter of law, that DOP's actions in directing plaintiff to undergo such examination was not caused by plaintiff's protected activity. *Treglia*, 313 F.3d at 721 (one-month gap sufficient to establish causal link). Therefore, plaintiff has established a *prima facie* case of retaliation based on this occurrence.[37]

■ DOP argues that the decision to require plaintiff to undergo the § 72 examination, like the decision to transfer her from the SOU parole officer position and Fairchild's supervision of her, was made for a legitimate, non-discriminatory reason: "Dissatisfaction with plaintiff's work performance and her unprofessional and difficult behavior." (Defs. Mem. Supp. Summ. J. at 18.) Specifically, DOP argues that it referred plaintiff for the examination "as an attempt to assist [her]," due to her "increasingly hostile behavior towards … Fairchild … whom [plaintiff] accused of being a threat to plaintiff and her family." (*Id.* at 20.) Without making any determination as to the accuracy of DOP's factual claims about plaintiff's conduct, we find that DOP has satisfied its burden of setting forth a legitimate, non-retaliatory reason for referring plaintiff to the § 72 examination. *Rosenblatt*, 2007 WL 2197835, at *7, 9 (Plaintiff's "disruptive conduct in the office" was a legitimate reason for adverse employment actions, which adverse actions included, *inter alia*, requiring plaintiff to undergo a § 72 examination.).

■ However, construing the record in the light most favorable to plaintiff, we are again satisfied that an issue of fact remains as to whether this reason was pretextual. The evidence of strong temporal proximity between plaintiff's complaints and the decision to refer her for the § 72 examination indicate that summary judgment is inappropriate. *See Quinn*, 159

---

**36.** It is unclear from the record exactly when, in the fall of 2006, Fairchild made her recommendation that plaintiff undergo the examination. However, Bush relayed her concerns about plaintiff to Burdi in an email dated October 4, 2006. (Burdi Decl., Ex. A.) Therefore, Fairchild must have made her recommendation at some point on or before that date.

**37.** We do not address whether DOP engaged in actionable retaliatory conduct by "falsely advising plaintiff's co-workers that plaintiff was mentally unstable," (Pl. Mem. Opp. Summ. J. at 22), because plaintiff has not introduced any evidence based on personal knowledge to support this assertion. *Goenaga*, 51 F.3d at 18 (non-moving party may not rely on conclusory statements to defeat summary judgment).

F.3d at 770. Moreover, DOP relies on the testimony of Fairchild, Bush and Burdi—individuals alleged to have retaliated against plaintiff—to support the preferred reason for referring plaintiff for the examination. *Id.* Furthermore, we find that there are issues of fact regarding plaintiff's alleged hostile behavior and the circumstances surrounding her accusation that Fairchild posed a threat to her family.[38] Therefore, we decline to grant summary judgment on plaintiff's claim that DOP's conduct, in referring her for the examination, was retaliatory.

### E. *Supervision Under Graham*

Plaintiff argues that she was subjected to retaliatory treatment by her supervisors, including Graham. (PL.Mem. Opp. Summ. J. at 22.) With regard to Graham, who supervised plaintiff from September 2006 to May 2008, plaintiff claims, as discussed in more detail above (*see* Background, Section DLL.), that Graham falsely accused her of deficiencies in her work product and productivity; imposed improper restrictions on her while not imposing them on other parole officers in the Peekskill Area Office; required her to attend "unnecessary and time-consuming meetings"; subjected her to micro-management; "fail[ed] to reassign cases to [her] when she reassigned cases to all other [p]arole [o]fficers in her unit"; failed to pay her for overtime that she worked; selectively enforced rules regarding the formal procedure for obtaining arrest warrants; prepared a "defective" negative performance evaluation about plaintiff; and refused to counsel a parole officer who, "[i]n violation of DOP policy, . . . .

transferred two cases to plaintiff involving parolees who had tested positive for drug use." (Pl. R. 56.1 Stmt, ¶¶ 112–127.)

▮▮▮ Plaintiff supports these contentions primarily with Jones's sworn statements, as well as with her own testimony. DOP argues that Jones, as plaintiff's co-worker, lacks the requisite personal knowledge as to these contentions, as required under FED.R.CIV.P. 56(e). (Defs. Reply Mem. Supp. Summ. J. at 6.) Rule 56(e) provides that affidavits submitted in support of or opposition to a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." DOP argues that Jones lacked knowledge about the deficiencies in plaintiff's work performance and about the discipline of other parole officers who failed to abide by DOP policies. (Defs. Reply Mem. Supp. Summ. J. at 7.) However, Jones states, in his affidavit, that he was the PEF Shop Steward from 2005 to 2008, that he has "personal knowledge of the . . . retaliation to which [plaintiff] was subjected," and that, as Shop Steward, he was "privy to knowledge of many incidents concerning [p]arole [o]fficers' conduct." (Jones Aff. ¶¶ 4, 14.) Jones's sworn statements that he has personal knowledge of the events about which he testifies in his affidavit satisfy the personal knowledge requirement of Rule 56(e) and his affidavit is admissible for purposes of this motion. We note that an assessment of Jones's credibility is more appropriately made by a jury.

---

**38.** Plaintiff's sworn statements indicate that she requested that Fairchild be barred from coming to her home because of DOP management's attempts to send Fairchild to her home "unnecessarily," and that Fairchild, Bush and Burdi misconstrued this request. (Flynn Aff. ¶¶ 46, 48.) Fairchild testified that she inter-

preted plaintiff's request as meaning plaintiff was, essentially, asking for a protective order "because [Fairchild] is so deranged that she is going to, in fact, kill her or her children." (Ullrich Aff'm, Ex. 4 (Fairchild Dep. 161:19–162:17).)

■ Having determined that plaintiff's evidence of her treatment by Graham is admissible, and viewing the record in the light most favorable to plaintiff, we find that, if a jury accepts plaintiff's rendition of the facts, it might determine that Graham's supervision of plaintiff would deter a reasonable employee in plaintiff's position from reporting gender discrimination. *Kessler*, 461 F.3d at 207. A reasonable employee may well be dissuaded from reporting such discrimination if she were, *inter alia*, faced with false accusations about her work performance, singled out for improper restrictions and delays in receiving overtime payments and subjected to selective enforcement of the rules regarding certain formal procedures. *Raia*, 2007 WL 608129, at *6; *Edwards*, 2007 WL 2027913, at *10–11 (both cases considering individual claims of retaliatory treatment collectively and finding a jury could find such claims sufficient to constitute an adverse employment action). Therefore, we find that plaintiff has satisfied the third prong of her *prima facie* case based on Graham's behavior in Graham's supervision of her.

■ Plaintiff has also established sufficient evidence of causation to preclude dismissal of her claim on a motion for summary judgment. Many of plaintiff's allegations regarding Graham's conduct toward her lack a date on which they are alleged to have occurred. Viewing the record in the light most favorable to plaintiff, as we must on a motion for summary judgment, we infer that Graham's conduct, as described by plaintiff, commenced immediately when Graham became plaintiff's supervisor, on September 21, 2006. Plaintiff complained of retaliatory treatment in September and October of 2006. The strong temporal proximity between plaintiff's protected activity and the commencement of Graham's conduct is such that a jury could find that the latter was caused by the former. *Treglia*, 313 F.3d at 721.

Furthermore, plaintiff has introduced some evidence that Graham singled her out for retaliatory treatment, for example by enforcing the formal procedure for obtaining warrants against her, but not against fellow employees who obtained warrants, which supports plaintiff's showing of causation. *DeCintio*, 821 F.2d at 115 ("Proof of causal connection can be established *indirectly* . . . through other evidence such as disparate treatment of fellow employees who engaged in similar conduct.") (internal citations omitted; emphasis in original).

DOP argues that plaintiff has not established causation because "Graham had no knowledge that plaintiff had filed [her SDHR] complaint until a few days before her deposition in 2008." (Defs.Mem.Supp.Summ. J. ¶ 18.) Assuming this factual contention is true, DOP fails to address whether Graham knew of the numerous informal complaints about retaliatory treatment that plaintiff made subsequent to her SDHR complaint, including the complaints of September and October 2006. Moreover, the Second Circuit has held that "to satisfy the knowledge requirement, [nothing] more is necessary than general corporate knowledge that the plaintiff has engaged in protected activity." *Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir.2000). It is undisputed that DOP knew of plaintiff's SDHR complaint and her later informal complaints. This is sufficient to satisfy the knowledge requirement with respect to a DOP employee. *See Kessler*, 461 F.3d at 210 (Even if employee of defendant-government agency who imposed adverse employment on plaintiff was unaware of plaintiff's discrimination complaints, such lack of knowledge did not preclude finding of causation where defendant-government agency knew of plaintiff's SDHR complaint.) We are satisfied that plaintiff has establish a *prima facie* case with regard to

her retaliation claim to the extent that it is based on Graham's supervision of her.

▇▇▇▇ DOP appears to set forth as legitimate, non-discriminatory reasons for Graham's conduct: (1) dissatisfaction with plaintiff's performance; and (2) Graham's new management style. (Defs. Reply Mem. Supp. Summ. J. at 13; Defs. Mem. Supp. Summ. J. at 24.). However, plaintiff, again, has proffered enough evidence that, if credited by a jury, could establish that this reason was pretextual. We note that factual issues exist regarding the quality of plaintiff's work performance and the merits of Graham's claims about such performance.[39] In addition, the strong showing of temporal proximity between plaintiff's complaints and Graham's commencement of her supervision, as well evidence of disparate treatment toward plaintiff as compared to other parole officers, could permit a factfinder to conclude that Graham's motivation for treating plaintiff in an adverse way was based on the fact that plaintiff complained about discriminatory and retaliatory conduct. If a jury believes plaintiff's version of the events, it may discredit DOP's contention that Graham's manner of supervising plaintiff was warranted because of plaintiff's work performance. Therefore, we cannot grant summary judgment on plaintiff's retaliation claim, to the extent that it is based on plaintiff's treatment by Graham.

We deny DOP's motion for summary judgment with respect to plaintiff's retaliation claim on all of the grounds described herein, upon which grounds we infer that she has based her claim.

---

**39.** For example, while DOP contends that plaintiff's work performance was characterized by, *inter alia,* late CMS entries, (Defs. R. 56.1 Stmt. ¶ 42), plaintiff avers that Graham falsely accused her of failing to make CMS entries when in fact she had made such entries (Pl. R. 56.1 Stmt. ¶¶ 110–11) and submits evidence indicating that other parole officers were often late in their CMS entries.

## CONCLUSION

For all of the foregoing reasons, defendants' motion for summary judgment (Doc. # 10) is granted in part and denied in part. Summary judgment is granted with respect to plaintiff's disparate treatment claims brought under Title VII against defendant New York State Division of Parole ("DOP") and under the Fourteenth Amendment pursuant to § 1983 against defendant Michael Burdi. Summary judgment is denied with respect to plaintiff's retaliation claim brought under Title VII against DOP. Because we did not rely on the Walsh Affidavit, it is not necessary for us to decide defendants* motion to strike (Doc. # 29) this evidence.

SO ORDERED.