Deborah DeNIGRIS, Plaintiff,

v.

NEW YORK CITY HEALTH AND HOSPITALS CORP., et al., Defendants.

No. 09 Civ. 6808 (DAB).

United States District Court, S.D. New York.

March 9, 2012.

Kevin Todd Mintzer, Kevin Mintzer, P.C., New York, NY, for Plaintiff.

Daniel Chiu, Tarter Krinsky & Drogin LLP, New York, NY, for Defendants.

## MEMORANDUM & ORDER

DEBORAH A. BATTS, District Judge.

Plaintiff Deborah DeNigris ("Plaintiff" or "DeNigris") brings this complaint for race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. of the Civil Rights Act of 1964 ("Title VII"); of the New York State and New York City Human—Rights Laws ("NYSHRL" and "NYCHRL"); of 42 U.S.C. § 1981; and of the Fourteenth Amendment to the United States Constitution as enforced through 42 U.S.C. § 1983.[1]

Now before the Court is Defendants' Motion for Summary Judgment on all of Plaintiff's claims, brought pursuant to Fed. R.Civ.P. 56.

For the reasons set forth below, Defendants' Motion is GRANTED in part and DENIED in part.

## I. FACTUAL BACKGROUND

The following facts are undisputed except where noted. Familiarity with the facts is assumed, and the facts are laid out here only as necessary for resolution of the Motion before the Court.

Plaintiff Deborah DeNigris, an African–American female, began working for Defendant New York City Health and Hospitals Corporation ("HHC") in either June or September of 2002. (56.1 Stmts. ¶¶ 2.[2]) According to Plaintiff, while working part time at HHC, she also worked for Project Renewal, an organization that provides services to the homeless. (Pl. 56.1 ¶ 2.)

Plaintiff applied for and was hired for the full-time position of Assistant Director of Nursing ("ADN"), Preceptor, in HHC's Health and Home Care division on August 10, 2005. (56.1 Stmts. ¶¶ 2.)

HHC Operating Procedure 2041 states, in relevant part, that new employees may "be appointed at a salary (within the established range of the title) of up to 20% above the salary they received in their most recent employment prior to appointment at HHC," (Pl. 56.1 ¶ 5.) Defendant Ann Frisch testified that under this policy, as applied, it was permissible to aggregate a prospective employee's salaries from

---

1. Though Defendants devote substantial argument in their opening brief to the perceived deficiencies of Plaintiff's "hostile work environment" claim, see Mov. Mem. 15–18, no such claim appears on the face of Plaintiff's complaint. Plaintiff not having alleged a hostile work environment claim, the Court does not reach whether Defendants would be entitled to summary judgment on such a claim if brought.

2. Citations to "56.1 Stmts." invite a comparison of the corresponding paragraphs of the Local Rule 56.1 Statements submitted by Defendants and by Plaintiff. Citations to "Defs. 56.1" and to "Pl. 56.1" refer to the Local Rule 56.1 statement submitted by Defendants and to the responsive Local Rule 56.1 statement submitted by Plaintiff, respectively.

multiple positions, if those salaries were properly documented, (Frisch Dep. 35–37.)

Plaintiff's annual salary in the ADN position was $70,000.00. (56.1 Stmts. ¶¶ 3.) Defendants contend that this sum represented a 20% increase from Plaintiff's prior confirmed annual salary, while Plaintiff contends that it represented an 18.5% increase from her prior salary at Project Renewal alone despite the fact that Defendants were aware that the Project Renewal salary represented only a portion of her pay during prior years and that she had also worked part time at HHC. (56.1 Stmts. ¶¶ 4.) Accordingly, Plaintiff contends, the $70,000.00 salary she received as an ADN Preceptor actually represented a substantial decrease from her previous earnings. (Pl. 56.1 ¶ 4.) Plaintiff further contends that she accepted the salary only because Joan Altman ("Altman"), who hired her as an ADN Preceptor, promised her that her salary would be increased after six months of employment. (Pl. 56.1 ¶ 3.)

HHC hired another black woman, Marjorie Silcott ("Silcott"), as an ADN Preceptor several months before HHC hired Plaintiff for that position. (Silcott Decl. ¶¶ 2–3.) Silcott was apparently well-qualified for the position, having approximately 40 years' experience as a nurse, including approximately 19 years of supervisory experience. (Silcott Decl. ¶ 4.) Despite Silcott's protestations that she deserved a higher salary when hired, Silcott too received and accepted from Defendant Frisch a salary offer that represented a substantial decrease from her previous salary. (Silcott Decl. ¶¶ 5–6.)

HHC hired a white woman, Jeanmarie Fitch ("Fitch"), as an ADN Preceptor in October 2005. (Pl. 56.1 ¶ 96.) Fitch possessed less experience and education than Plaintiff. (Pl. 56.1 ¶ 97.) Fitch was hired at a salary which represented an increase from her prior salary and which approached the maximum salary available for the ADN Preceptor position. (Pl. 56.1 ¶¶ 98–101.) Fitch's annual salary was $19,000.00 higher than Plaintiff's salary for the same position. (Pl. 56.1 ¶ 104.)

Joan Altman ("Altman") supervised Plaintiff and Fitch when they held positions as ADN Preceptors.[3] (56.1 Stmts. ¶¶ 8.) Less than a year after Plaintiff began working as an ADN Preceptor under Altman, Plaintiff was removed from the Preceptor position and assigned to be a Clinical Technology Manager reporting to Defendant Frisch, who later became Executive Director. (56.1 Stmts. ¶¶ 11.) Defendants contend that the transfer occurred because Plaintiff had difficulties in getting along with her fellow ADN Preceptor, Fitch, and because of Plaintiff's limitations as a trainer of nursing interns. (E.g. Defs. 56.1 ¶ 12–13, 15, 17.) Altman testified that Plaintiff had been the subject of complaints by the interns she was tasked with training, though a memorandum Altman sent to Frisch less than two months after the complaints were allegedly made describes Plaintiff as "a talented and skilled teacher and mentor to the nurse interns." (Defs. 56.1 ¶ 13; Pl. 56.1 ¶ 13.) Altman also gave Plaintiff an exceedingly positive performance review around the same time, though Altman now testifies that she does not believe Plaintiff deserved the high ratings and positive comments Altman gave her. (Mintzer Decl. Ex. K; Altman Dep. 87–91, 142–44.) Defendant Frisch testified that Plaintiff was transferred not because of interpersonal problems but because the new position required computer skills and Plaintiff had better computer skills than

---

3. There is a dispute, not material for present purposes, as to exactly when Plaintiff ceased being supervised by Altman. (*See* 56.1 Stmts. ¶¶ 8–11.)

Fitch, the other ADN Preceptor at that time. (Frisch Dep. 158–59.)

Plaintiff contends that ADN Fitch behaved unprofessionally toward her and toward the interns but that her complaints about Fitch were not addressed by Altman. (Pl. 56.1 ¶¶ 12–13, 105–09, 123–25.) Plaintiff and another person present memorialized arguably unprofessional behavior by Fitch in contemporaneous memoranda which were submitted to supervisory officers at HHC. (Chiu Decl. Ex. L; DeNigris Decl. Ex. A.)

During the time she supervised Plaintiff, Altman wrote multiple very positive performance reviews and memoranda concerning Plaintiff's job performance, including one in which she sought a pay increase for Plaintiff, though Altman in her deposition disavowed the positive reviews and memoranda as—inaccurate or untruthful. (Mintzer Decl. Ex. J and K; Altman Dep. 113–14, 140.) Plaintiff did not receive the requested salary increase. (Pl. 56.1 ¶¶ 120–21.) Plaintiff's final performance review prior to her transfer out of the ADN Preceptor position was mixed and rated Plaintiff high in some areas and low in others. (*See* Chiu Decl. Ex. M.) Plaintiff did not initially sign the final performance review by Altman and instead submitted a rebuttal in which she stated that her review was inaccurate and that Altman was biased against her because Plaintiff had complained about Fitch, who was Altman's friend. (56.1 Stmts. ¶¶ 18–19; Chiu Decl. Ex. M–N.)

Beginning in or about August 2006, Plaintiff was transferred to the role of Clinical Technology Manager, reporting to Defendant Frisch. (56.1 Stmts. ¶¶ 21.) Defendant Frisch testified in her deposition that she received complaints from other nurses about Plaintiff's behavior while she was in this role, though Plaintiff testified that Frisch had never spoken with her about any such complaints and Defendants have produced no contemporaneous evidence that complaints were made. (56.1 Stmts. ¶¶ 22–23.)

In August, 2007, Defendant Frisch provided Plaintiff with a performance review that was critical of her interpersonal skills but that also noted that Plaintiff was a "skilled practitioner who has demonstrated exceptional skill and flexibility" in her new role, (56.1 Stmts. ¶¶ 25.) Parties differ as to exactly what took place at the meeting at which Defendant Frisch and Plaintiff discussed the performance review. Defendants contend that Plaintiff was argumentative and did not readily accept the criticism of her interpersonal skills. (Defs. 56.1 ¶ 26–27.) Plaintiff testified that Frisch made inappropriate comments at the meeting, stating that she was afraid of Plaintiff and asking whether Plaintiff carried a gun. (Pl. 56.1 ¶ 26–27.) Plaintiff testified that she believed Defendant Frisch's comments were racially biased and motivated by stereotypes of African Americans as aggressive and prone to violence. (Pl. 56.1 ¶ 27.) Plaintiff submitted a rebuttal to her performance review. (Chiu Decl. Ex. P.)

In September 2007, Vivian Figueroa ("Figueroa") became Plaintiff's supervisor. (56.1 Stmts. ¶¶ 29.)

On or about September 30, 2007, Plaintiff submitted a written complaint to HHC's EEO office. (Chiu Decl. Ex. AA.) In that document, Plaintiff complained that she had been discriminated against on the basis of her race in the setting of her salary, in the failure to increase her salary, and in her removal from the ADN Preceptor position. (*Id.*) She also complained that Frisch had said she was afraid of Plaintiff and had wondered whether Plaintiff carried a gun, and further alleged that Frisch and other members of senior management treated white employees favorably and that black employees were at a

substantial disadvantage in receiving promotions and compensation. (*Id.*)

On or about November 26, 2007, Figueroa issued Plaintiff a memorandum which admonished Plaintiff to conduct herself "in a professional manner without raising your voice to me or anyone else in the office." (Chiu Decl. Ex. Q.) Plaintiff contends, and memorialized in a contemporaneous writing, that Figueroa repeatedly asked Plaintiff about her discrimination complaint prior to giving her the memorandum and that Figueroa told her that she had to give Plaintiff the memorandum in order to protect herself in light of Plaintiff's EEO complaint. (DeNigris Dep. 51–54; Chiu Decl. Ex. R.)

In late 2007, Plaintiff was transferred to HHC's Compliance Department, where she was supervised by Shaguadah Hawkins ("Hawkins"). (56.1 Stmts. ¶¶ 33–34.) Hawkins, in turn, was supervised by Steven Chall ("Chall"). (*Id.*) On January 25, 2008, Plaintiff sent a memorandum to Chall in which she expressed concern that she had been transferred to a position which she felt did not match her skill set; had been transferred from a management-level position to what she viewed as an entry-level position, where she replaced an employee with substantially less experience, skills, and education who had nevertheless been better paid than Plaintiff; and was expected to report to Hawkins, a clinical supervisor, though she had herself previously been a clinical supervisor. (Chiu Decl. Ex. S.) In raising these concerns, Plaintiff noted that she fully understood that Defendant "Frisch makes decisions about salaries and job assignments, please know that I sincerely appreciate your outreach and support during yet another difficult transition." (*Id.*)

On March 21, 2008, Plaintiff's attorney had a letter hand delivered to HHC's President, stating that Plaintiff and another HHC employee, Raymonde Thadal, had meritorious claims of race discrimination and retaliation. (Chiu Decl. Ex. Z.) Defendant Frisch testified at her deposition that she consulted with in-house counsel that same day and determined that Plaintiff would be fired. (Frisch Dep. 100–101.)

Chall testified that Defendant Frisch told him that Plaintiff was to be fired and instructed him to prepare a final evaluation of Plaintiff's performance. (Chall Dep. 66–68, 74.) Chall told Hawkins that Plaintiff would be fired and instructed her to prepare a final performance evaluation. (Hawkins Dep. 65–66.) Hawkins testified that she understood that HHC did not wish the final performance evaluation to be a positive one. (Hawkins Dep. 7 8.) In the evaluation Hawkins prepared, she rated Plaintiff in only two of four areas of responsibility, giving her a rating of "fully competent" in both. (Mintzer Decl. Ex. V.) Hawkins gave Plaintiff an overall performance rating of "unacceptable." (*Id.*)

## II. DISCUSSION

### A. *Timeliness of Claims*

Defendants argue that Plaintiff's claims are barred, in part, by the applicable statutes of limitation. The Court analyzes each applicable statute of limitations in turn.

#### 1. *Title VII Claims*

 To bring a timely Title VII discrimination claim based on discrete acts of discrimination, a plaintiff must file a charge with the Equal Employment Opportunity Commission (the "EEOC") within 300 days of the claimed discriminatory act. *Petrosino v. Bell Atlantic*, 385 F.3d 210, 219 (2d Cir.2004).

The Lilly Ledbetter Fair Pay Act of 2009 (the "Ledbetter Act"), Pub.L. No. 111–2 S 3(A), 123 Stat. 5, *codified at* 42 U.S.C. S 2000e–5(e)(3)(A), provides that an

unlawful employment practice occurs, inter alia, "when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice." 123 Stat. at 5–6. The issuance of each paycheck affected by application of a prior discriminatory compensation decision therefore constitutes an independent, discrete act of discrimination. *See* 42 U.S.C. § 2000e–5(e)(3)(A). Under the Ledbetter Act, "liability may accrue and an aggrieved person may obtain relief ... including recovery of back pay for up to two years preceding the filing of the charge, where the unlawful employment practices that have occurred during the charge filing period are similar or related to unlawful employment practices with regard to discrimination in compensation that occurred outside the time for filing a charge." 42 U.S.C. § 2000e–5(e)(3)(B).

■ Plaintiff filed her EEOC charge on July 1, 2008. Accordingly, if Plaintiff is successful at trial, she may recover back pay for a period beginning July 1, 2006, and can recover for non-pay discrete discriminatory acts that occurred within 300 days of the filing of her EEOC charge, i.e. those that occurred on or after September 5, 2007. Of course, evidence of acts of discrimination for which recovery is time-barred "may constitute relevant 'background evidence in support of a timely claim,' and we will consider it as such." *Petrosino v. Bell Atlantic*, 385 F.3d at 220 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)).

### 2. Sections 1981 and 1983 [4]

Claims brought under causes of action created by the 1991 amendments to § 1981 are subject to the federal "catch-all" four-year statute of limitations prescribed by 28 U.S.C. § 1658. *Jones v. R.R. Donnelley & Sons Company*, 541 U.S. 369 at 379–81, 124 S.Ct. 1836, 158 L.Ed.2d 645 (2004); *Thomas v. New York City Health and Hospitals Corp.*, No. 02 Civ. 5159, 2004 WL 1962074 (S.D.N.Y. Sept. 2, 2004). The same is true when claims authorized by the 1991 amendments to § 1981 are brought against state actors under S 1983. *Ortiz v. City of New York*, 755 F.Supp.2d 399, 405–8 (E.D.N.Y.2010) (conducting detailed analysis); *see also Harmon v. Patrolman's Benevolent Ass'n*, 199 Fed.Appx. 46 (2d Cir.2006) (unpublished summary opinion) (observing, without explaining, that "the applicable statute of limitations on Section 1983 claims [in New York] is 3 years (or 4 years, if the claims are set forth under 28 U.S.C. § 1658(a))").

The Civil Rights Act of 1991 modified § 1981 to provide protection against discriminatory conduct occurring within contractual relationships (including employment relationships) after the contract is formed. *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 124 S.Ct. 1836, 158 L.Ed.2d 645 (2004). · ·

■ Here, to the extent Plaintiff's § 1981 and § 1983 claims seek recovery for discriminatory acts occurring in the course of her contractual relationship with Defendants, her cause of action was authorized by the 1991 amendment and the four-year federal catch-all statute of limitations will apply. To the extent that Plaintiff seeks recovery for discriminatory acts which took place in the initial formation of

---

**4.** Section 1983 provides the exclusive federal remedy against state actors for violations of Section 1981. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 723–25, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). Though Parties have not briefed the issue, it appears to the Court that Plaintiff's Section 1981 claims are thus duplicative of her Section 1983 claims.

her employment contract, however, her cause of action preexisted the 1991 amendment, and the otherwise-applicable three-year statute of limitations will apply.

Plaintiff filed this case on July 31, 2009. She is thus barred from recovering under §§ 1981 and 1983 for discriminatory acts in the formation of her contract if they occurred prior to July 31, 2006, and is barred from recovering for discriminatory acts which occurred within the contractual relationship if they occurred before July 31, 2005. Again, evidence of time-barred acts may be presented for context.

### 3. NYSHRL and NYCHRL

■ Claims brought under the NYSHRL and NYCHRL are subject to a three-year statute of limitations, which is tolled for the period between the filing of an EEOC charge and the issuance by the EEOC of a right-to-sue letter. *Wilson v. New York City Police Dept.*, 2011 WL 1215735, *4 (S.D.N.Y. Mar. 25, 2011). Here, Plaintiff received her right-to-sue letter on May 9, 2009, 313 days after she filed her charge on July 1, 2008. Plaintiff is therefore time-barred from recovering under the NYSHRL or NYCHRL for any acts of discrimination which occurred prior to September 21, 2005, three years and 313 days prior to the filing of this suit, though evidence of such time-barred acts may be considered for context. *Flynn v. New York State Div. of Parole*, 620 F.Supp.2d 463 (S.D.N.Y.2009).

### B. Legal Standard for Summary Judgment

A district court should grant summary judgment when there is "no genuine issue as to any material fact," and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir.2005). Genuine issues of material fact cannot be created by mere conclusory allegations. *Victor v. Milicevic*, 361 Fed.

Appx. 212, 214 (2d Cir.2010). Summary judgment is appropriate only when, after drawing all reasonable inferences in favor of a non-movant, no reasonable trier of fact could find in favor of that party. *Melendez v. Mitchell*, 394 Fed.Appx. 739, 740 (2d Cir.2010).

In assessing whether summary judgment should be granted, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The non-movant may not rely upon speculation and/or conjecture to overcome a motion for summary judgment. *Burgess v. Fairport Cent. Sch. Dist.*, 371 Fed.Appx. 140, 141 (2d Cir.2010). Instead, when the moving party has documented particular facts in the record, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir.2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). While a court must always "resolv[e] ambiguities and draw [ ] reasonable inferences against the moving party," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986) (citing *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505), the non-movant may not rely upon "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Id.* at 12. Instead, when the moving party has documented particular facts in the record, "the opposing party must 'set forth specific facts showing that there is a genuine issue for trial.'" *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir.1986) (quoting Fed. R.Civ.P. 56(e)). Establishing the existence of genuine disputes of material fact requires going beyond the allegations of the pleadings, as the moment has arrived " 'to put up or shut up.' " *Weinstock v. Colum-*

*bia Univ.,* 224 F.3d 33, 41 (2d Cir.2000) (citation omitted). Thus, unsupported allegations in the pleadings cannot create a material issue of fact. *Id.*

The substantive law governing the case will identify those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 37 (2d Cir.1994).

## C. *Plaintiff's Racial Discrimination Claims*

Title VII makes it an unlawful employment practice "for an employer ... to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of," inter alia, "such individual's race, color, ... or national origin." 42 U.S.C. § 2000e–2(a)(1). The familiar *McDonnell Douglas* three-part burden-shifting framework governs the evaluation of discrimination claims brought under Title VII. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Leibowitz v. Cornell Univ.,* 584 F.3d 487 (2d Cir.2009) (applying three-step analysis to a claim under 42 U.S.C. § 2000e *et seq.*).

42 U.S.C. S. 1981 provides, in relevant part, that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts"—including employment contracts—"as is enjoyed by white citizens." 42 U.S.C. S. 1981(a). 42 U.S.C. § 1983 provides, in relevant part, that "[e]very person who, under color of [state law] .. subjects, or causes to be subjected, any citizen ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law ..." 42 U.S.C. § 1983. Claims for racial discrimination brought under Sections 1981 and 1983, too, are analyzed under the *McDonnell Douglas* framework. *See Patterson v. County of Oneida,* 375 F.3d 206, 225 (2d Cir.2004) ("Most of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981 ... and the factors justifying summary judgment dismissing [plaintiff's] Title VII claim against the municipal defendants for termination of his employment equally support the summary dismissal of his claims for termination brought under 42 U.S.C. §§ 1981 and 1983."); *see also Flynn v. New York State Div. of Parole,* 620 F.Supp.2d 463, 488 (S.D.N.Y.2009) (same); *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506 n. 1, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (assuming but not deciding that the *"McDonnell Douglas* framework is fully applicable to racial-discrimination-in-employment claims under 42 U.S.C. § 1983") (citations omitted).

The NYSHRL and NYCHRL provide that it is unlawful "[f]or an employer ... because of an individual's ... race, creed, color, [or] national origin ... to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. Exec. Law § 296(1)(a); N.Y. City Admin. Code § 8–107(1)(a). Claims brought under the NYSHRL and the NYCHRL, like those brought under Title VII and Sections 1981 and 1983, are evaluated on summary judgment under the *McDonnell Douglas* bur-

den-shifting analysis.[5] *Bennett v. Health Management Sys., Inc.*, 92 A.D.3d 29, 936 N.Y.S.2d 112 (1st Dept.2011); *Dawson v. Bumble & Bumble*, 398 F.3d 211, 216–17 (2d Cir.2005).

Under *McDonnell Douglas*, a plaintiff bears the initial burden of establishing a prima facie case of discrimination through direct or circumstantial evidence. *Windham v. Time Warner, Inc.*, 275 F.3d 179, 187 (2d Cir.2001). The burden is minimal. (*Id.*) In order to make out a prime facie case, a plaintiff must demonstrate: 1) that she is a member of a protected class; 2) that she was qualified for the position held; 3) that she suffered an adverse employment action; and that 4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Holcomb v. Iona College*, 521 F.3d 130, 138 (2d Cir.2008). A plaintiff may raise such an inference by showing that the employer subjected her to disparate treatment, that is, treated her less favorably than a similarly situated employee outside of the protected group. *Int'l Broth. of Teamsters v. U.S.*, 431 U.S. 324, 335, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

A plaintiff who makes out a prima facie case establishes a presumption of discrimination, at which point the burden of production shifts to the defendant. *Woodman v. WWOR–TV, Inc.*, 411 F.3d 69, 76 (2d Cir.2005). To meet its burden, the defendant must articulate a "legitimate, nondiscriminatory reason" for the challenged conduct. *Texas Dept. of C'mty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). "If such a reason is provided, the plaintiff may no longer rely on the presumption raised by the prima facie case but may still prevail by showing, without the benefit of the presumption, that a reasonable jury could conclude that the employer's [challenged conduct] was in fact the result of discrimination," *Ghent v. Moore*, 324 Fed.Appx. 55, 56 (2d Cir.2009) (citing *Holcomb v. Iona College*, 521 F.3d 130, 141 (2d Cir. 2008)). To prevail, the plaintiff need not prove that the explanation offered by the employer was entirely false "but only that ... [the defendant's] stated reason was not the only reason" and that consideration of an impermissible factor "did make a difference." *Montana v. First Federal Savings & Loan Ass'n of Rochester*, 869 F.2d 100, 105 (2d Cir.1989).

■ Here, Plaintiff has satisfied her initial, minimal burden of establishing a prima facie case of discriminatory treatment. She is a member of a protected class and has presented evidence that she was treated and paid differently than similarly-situated individuals who were members of other racial groups when hired for the ADN Preceptor position, when transferred within HHC, and when terminated from her employment within HHC. Though Defendants argue that the challenged employment actions were not adverse as a matter of law because Plaintiff's salary was not

---

**5.** The *McDonnell Douglas* framework continues to apply to claims brought under the NYCHRL after passage of the New York City Local Civil Rights Restoration Act, which "was enacted to ensure the liberal construction of the [NYCHRL] by requiring that *all* provisions ... be construed broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Bennett*, 936 N.Y.S.2d at 115 (citations and internal quotation marks omitted). Accordingly, a court analyzing an NYCHRL discrimination claim must be particularly mindful that the plaintiff's burden in stating a prima facie case is de minimis and that a defendant, on a motion for summary judgment, "bears the burden of showing that, based on the evidence before the court and drawing all reasonable inferences in plaintiff's favor, no jury could find defendant liable under any of the evidentiary routes: under the *McDonnell Douglas* test, or as one of a number of mixed motives, by direct or circumstantial evidence." *Id.* at 117–21.

reduced, the Court is satisfied that a reasonable jury could conclude that the decisions made by Defendants with regard to Plaintiff's salary as compared with her prior salary and those offered to other candidates, the denial of a raise despite her highly positive performance reviews, and Plaintiff's transfer to positions for which she was arguably less suited and in which she enjoyed less responsibility were sufficiently "adverse" to constitute adverse employment actions. Further, Plaintiff has presented evidence supporting an inference of discrimination by showing that new hires who were white received salary increases when hired, while those who were black did not, and that her replacement as an ADN Preceptor, when she was transferred, was a white woman. Plaintiff has also presented competent evidence showing that other members of Plaintiff's protected class were treated differently than their white peers under circumstances giving rise to an inference of discrimination. Thus the burden shifts to Defendants to articulate by competent evidence the existence of a legitimate non-discriminatory reason for the challenged employment actions.

■ Defendants argue that Plaintiff's salary was set in accordance with HHC procedures, both when Plaintiff was hired and again when she requested a raise following her six-month review. However, the evidence put forward by Defendants is internally inconsistent and thus gives rise to genuine issues of material fact whether Defendants considered her total salary at her previous positions and, if so, why her initial salary was not set at a rate which more closely matched or which was an increase from her previous earnings. Similar issues of fact exist with regard to why Plaintiff was not granted a raise after her initial review and whether racial animus played any part in that decision, especially in light of record evidence that Defendants' explanations for both salary decisions have changed over time and that Defendants, when hiring, generally made lower salary offers to black applicants than to whites.

With regard to Plaintiff's transfer internally and termination, Defendants have presented evidence which suggests that Plaintiff was transferred because of interpersonal difficulties she had with other employees. However, there exist genuine issues of material fact whether those alleged interpersonal difficulties, or Defendants' position that such difficulties existed, were motivated by conscious or unconscious racial animus toward Plaintiff. The record before the Court contains contrasting and often self-contradictory testimony with regard to Plaintiff's relationship with other employees and the ways in which those relationships were perceived or perhaps manipulated by Defendants and by others within HHC. For example, at least one of Defendants' witnesses, Joan Altman, testified during her deposition that the contemporaneous documents she had created concerning Plaintiff's relationships with others or her job performance were false when she created them and/or that with hindsight she no longer believes they are accurate. Altman further testified that she took notes during conversations in which coworkers complained about Plaintiff, which would support Defendants' explanations, if they existed, but that she counter-intuitively destroyed those notes some time after Plaintiff filed first her EEOC charge and later this lawsuit. Accordingly, the Court cannot determine whether there exists a legitimate, nondiscriminatory reason for the challenged actions without impermissibly weighing the credibility of witnesses who contradict each other and themselves. Summary judgment in Defendants' favor on Plaintiff's discrimination claims is therefore inappropriate.

### D. *Plaintiff's Retaliation Claims*

Retaliation claims brought under Title VII are analyzed under the same three-part burden shifting framework that applies to discrimination claims. *McMenemy v. City of Rochester*, 241 F.3d 279, 282–83 (2d Cir.2001). The analysis under the NYSHRL and NYCHRL is identical. *See Ferraro v. Kellwood Co.*, 440 F.3d 96, 99 (2d Cir.2006).

The plaintiff must first establish a prima facie case by showing that: (1) she participated in a protected activity; (2) the defendant knew of the protected activity; (3) plaintiff suffered an adverse employment action; and (4) a causal connection exists between the protected activity and the adverse action. *McMenemy v. City of Rochester*, 241 F.3d 279, 282–83 (2d Cir.2001). If the plaintiff sustains this burden, the employer must then articulate a legitimate, non-retaliatory reason for the adverse employment action. Once the employer offers such a reason, the presumption of retaliation disappears and "the employee must show that retaliation was a substantial reason for the adverse employment action." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir.2005).

Summary judgment as to Plaintiff's retaliation claims is inappropriate for the same reasons that it is inappropriate with regard to Plaintiff's discrimination claims. Plaintiff has stated a strong prima facie case that her internal transfer to Compliance and her eventual termination were precipitated by her filing of an EEOC charge and by her lawyer's sending a letter laying out the grounds for a possible discrimination suit, respectively. The Court is also satisfied that a jury very well could determine that a reasonable employee would find the reduction of duties and prestige Plaintiff experienced based on her transfer to Compliance to be sufficiently "adverse" to constitute an adverse employment action, and there can be little question that a reasonable employee would find termination adverse. The record contains contradictory evidence concerning whether Defendants were aware of the letter at the time they decided to terminate Plaintiff, but Plaintiff has nevertheless made a strong showing to meet the minimal burden of stating a prima facie case.

Defendants' arguments for the existence of legitimate reasons for Plaintiff's transfer and termination cannot satisfy the standard for summary judgment for the same reasons as their arguments concerning discrimination fail: they are supported, if at all, by testimony and documentation which are internally and externally inconsistent, at best, and dubious at worst, and which the Court cannot resolve without making impermissible credibility assessments. Summary judgment on Plaintiff's discrimination claims in Defendants' favor is therefore DENIED.

### E. *Municipal Liability Under Section 1983*

Plaintiff has not opposed Defendant's Motion with regard to municipal liability under § 1983. Accordingly, Plaintiff's claims against HHC and against Defendant Frisch in her official capacity are deemed abandoned. Defendants' Motion is GRANTED with regard to those claims.

### F. *Qualified Immunity*

Defendants contend that Defendant Frisch is entitled to qualified immunity in her individual capacity. However, it has long been clearly established that individuals have the right to be free from intentional race discrimination and retaliation in employment, and genuine issues of material fact exist as to whether Defendant Frisch personally engaged in intentional discrimination and retaliation against Plaintiff. Accordingly, a grant of qualified immunity is wholly inappropriate at this stage of the proceedings.

## III. CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment is GRANTED to the extent that Plaintiff shall not recover for any acts of discrimination for which recovery is time-barred. Defendants' Motion is further GRANTED with regard to Plaintiff's § 1983 claims against Defendant HHC and against Defendant Frisch in her official capacity, which Plaintiff is deemed to have abandoned. Defendants' Motion is DENIED in all other regards.

After the Court requested and received from Parties the complete transcripts of the depositions excerpted in their submissions on the Motion for Summary Judgment, Parties requested permission to file with the Clerk supplemental declarations containing complete deposition transcripts. Should Parties wish to make such a filing in order to preserve the record considered herein for appellate review, they shall do so not later than Monday, May 7, 2012.

Unless Parties notify the Court within ten days of the date of this Order that they seek an adjournment in order to pursue good-faith settlement negotiations, pre-trial submissions shall be made on the following schedule. Parties shall submit their Proposed Voir Dire Questions and Proposed Requests to Charge to this Court, in conformity with the Court's Individual Practices, no later than Monday, May 7, 2012. Parties shall file their Joint Pre–Trial Statement ("JPTS") and respective Memoranda of Law addressing the issues raised in the JPTS by May 7, 2012. Responses to the Memoranda of Law shall be submitted by May 21, 2012. There shall be no replies.

SO ORDERED.